**COMMONWEALTH LLOYDS INSURANCE COMPANY,**
Appellant,

v.

**H. Edward DOWNS, Appellee.**

**No. 2-89-289-CV.**

Court of Appeals of Texas, Fort Worth.

March 26, 1993.

Rehearing Overruled June 8, 1993.

Larry L. Gollaher and Wesley W. Chambers, Dallas, for appellant.

Hayes, Coffey & Berry, P.C., Richard D. Hayes and Jeffrey B. Robb, Denton, for appellee.

Before HILL, C.J., and LATTIMORE and DAY, JJ.

OPINION

LATTIMORE, Justice.

This is an action brought by H. Edward Downs ("Downs") against Commonwealth Lloyds Insurance Company ("Commonwealth") after its rejection of Downs' claim on his casualty insurance policy. The jury found in Downs' favor on his causes of action for: breach of the insurance contract; breach of the statutory and common law duty of good faith and fair dealing; violations of article 21.21 of the Texas Insurance Code; and violations of the Texas Deceptive Trade Practices—Consumer Protection Act ("D.T.P.A."). The court rendered judgment in favor of Downs for violations of article 21.21 of the Insurance Code, and breach of the duty of good faith and fair dealing; Commonwealth appeals this judgment. The trial court denied Downs any recovery for breach of the insurance contract, or the D.T.P.A. violations; in two cross-points, Downs appeals this action of the court.

We reverse and render a take-nothing judgment in favor of Commonwealth.

In June of 1986, Downs contacted the William Rigg Insurance Agency for the purpose of procuring insurance on property he owned in Cooke County, Texas. The property included a horse barn and a covered arena, and was to be leased to a tenant. By the terms of the lease, Downs was obligated to maintain property insurance on the property. Through his administrative assistant Downs informed the agency that he needed a fire and extended coverage policy that corresponded with the insurance clauses in the lease. The relevant lease provision states:

*CASUALTY INSURANCE:* Owner shall at all times during the term of this Lease maintain a policy or policies of insurance with the premiums paid in advance, issued by and binding upon some solvent insurance company, *insuring the building against loss or damage by fire, explosion or other hazards and contingencies* of the full insurable value; provided that Owner shall not be obligated in any way or manner to insure any personal property (including but not lim-

ited to, any furniture, machinery, goods or supplies) of Tenant which Tenant may have upon or within the lease[d] premises or any fixture installed by or paid for by Tenant upon or within the leased premises or any additional improvements which Tenant constructs on the leased premises. [Emphasis added.]

The insurance policy in question was issued by Commonwealth, effective September 23, 1986, for a one-year period; the policy was renewed for the period of September 23, 1987, through September 23, 1988. Under the section "PERILS INSURED AGAINST," the policy provides that "PROPERTY as described under Coverage D is insured against" the following conditions: fire and lightning; smoke; windstorm, hurricane, and hail; explosion; aircraft and vehicles; and riot and civil commotion. Each of these coverages contained one or more exclusions. An endorsement was added providing coverage for vandalism and malicious mischief. The policy provision with which we are concerned provides:

PROPERTY as described under Coverage D is insured against:

. . . .

**WINDSTORM, HURRICANE AND HAIL—**

EXCLUSIONS—Insurance against these perils does *not* cover:

[a, b, and d are not applicable to the instant case]

c. *Loss caused by rain, snow, sand or dust,* all whether driven by wind or not, *unless the wind or hail shall first make an opening in the walls or roof of the building,* and the Company shall then be liable only for loss to the interior of the building, or the insured property therein, caused immediately by rain, snow, sand or dust entering the building through such opening. . . . [Emphasis added.]

On January 6, 1988, Cooke County experienced a severe winter storm consisting of precipitation in various forms causing ice to accumulate on the roof of Downs' covered horse arena. The structure collapsed from the weight of the accumulated ice.

Soon thereafter, the property damage was reported by Downs to the William Rigg Agency. The "Property Loss Notice" submitted by the insurance agency to Commonwealth on January 11, 1988, and received by them on January 14, 1988, lists the "KIND OF LOSS (FIRE, WIND, EXPLOSION ETC)" as "Ice," and "DESCRIPTION OF LOSS & DAMAGE" as "Ice became heavy on barn-roof collapsed killing tenants 5 horses and damaging their trailer." This report of loss was handled by Jim Hayes, Regional Property Claim Manager for Crum & Forster Corporation, which owns Commonwealth. Hayes was the adjuster who reviewed the provisions of Downs' policy and the applicable coverage. Hayes determined that the reported peril which was alleged to have caused the loss was not a covered peril under the insured's policy. On January 18, 1988, Hayes notified Downs that the insurance policy did not extend coverage to include damage caused by weight of ice or snow or collapse.

On March 1, 1988, Hayes and a registered professional engineer traveled to the site of the loss to inspect the remains of the structure. Hayes testified that the purpose of the inspection was to determine whether there could have been any cause of the loss other than as reported by Downs, which might be covered under the policy. After this inspection, Commonwealth maintained its position that the cause of Downs' loss was not a covered peril under the insurance policy.

Downs filed the instant lawsuit seeking a declaratory judgment "that a collapse due to ice is covered by the policy." Additionally, Downs alleged the following causes of action:

By denying payment, Commonwealth breached the terms of the insurance contract;

By denying payment, Commonwealth breached the duty of good faith and fair dealing imposed upon an insurer by common law and by article 21.21, section 16 of the Texas Insurance Code;

Commonwealth misrepresented the benefits provided under the insurance

policy by failing to state material facts and by making statements in such a manner in order to mislead a reasonably prudent person to a false conclusion of a material fact; and

Commonwealth violated section 17.-46(b)(5), (7), (12), (23) and section 17.-50(a)(4) of the D.T.P.A.

### The Court's Charge

The court's charge submitted all of the alleged causes of action, and the jury answered in favor of Downs on all issues. *In summary,* the jury questions were answered as follows:

(1) Commonwealth did not provide Downs with a policy conforming to the requirements of the insurance clause of the lease.

(2) Weather conditions listed under Downs' insurance policy were the dominant cause of the collapse of his arena.

(3) $40,000 represents the diminution of market value of the area that was caused by the collapse.

(4 & 5) Commonwealth engaged in an "unfair or deceptive act or practice" that was a producing cause of damages to Downs, whose actual damages as a result of this conduct were $40,000.

(6 & 7) Commonwealth knowingly engaged in these unfair or deceptive acts, resulting in $40,000 additional damages to Downs.

(8–10) Commonwealth did not act in good faith in its dealings with Downs during the underwriting, investigating, processing, and denial of coverage; Commonwealth's failure to act in good faith was the proximate cause of damages to Downs; and Downs' actual damages were $40,000.

(11 & 12) Commonwealth's failure to act in good faith was intentional, willful, and in wanton disregard of the rights of Downs, whose exemplary damages were $40,000.

(13 & 16) Commonwealth engaged in a "false, misleading or deceptive act or practice" (as defined in the subparts which tracked the language of section 17.46(b)(5), (7), (12), (23) of the D.T.P.A.).

(14, 15 & 17) Commonwealth engaged in an "unconscionable action or course of action" that was a producing cause of damages to Downs; $40,000 would compensate Downs for his actual damages resulting from this unconscionable conduct; and his "additional" damages were $40,000.

### The Court's Judgment

Downs filed a Motion For Entry Of Judgment On Verdict, attaching a proposed judgment. The judgment which was later signed by the court is identical to Downs' proposed judgment. In its judgment, the court awarded Downs a total of $200,000, which reflected judgment of: $120,000 ($40,000 actual damages, $40,000 exemplary damages, and $40,000 additional damages) under his cause of action for violations of article 21.21 of the Texas Insurance Code; and $80,000 ($40,000 actual damages, $40,000 exemplary damages) under his cause of action for breach of the duty of good faith and fair dealing. Additionally, Downs was awarded prejudgment and postjudgment interest and attorneys' fees. The judgment denied Downs any recovery under his causes of action for breach of contract or for violations of the D.T.P.A.

### Commonwealth's Points of Error

Commonwealth has appealed on the grounds that there is no evidence, or the evidence is factually insufficient, to support the jury's findings of breach of contract, violations of the Texas Insurance Code and the D.T.P.A., and breach of the duty of good faith and fair dealing. Additionally, Commonwealth asserts: the Insurance Code claim and the breach of the duty of good faith claim should have been denied as a matter of law; the breach of the duty of good faith jury question was improperly worded; judgment for damages under the Insurance Code and under the cause of action for breach of the duty of good faith improperly allows multiple recoveries for the same conduct; and the judgment for additional or exemplary damages is a violation of due process under the Texas and United States Constitutions.

Although the trial court's judgment did not award damages to Downs on his causes of action for breach of the insurance contract, or violations of the D.T.P.A., all of Downs' causes of action arise from one transaction, beginning with the procurement of the insurance policy by him, and ending with the denial of his damage claim. Additionally, the legal concepts involved in these causes of action are interrelated. Further, Downs raises two cross-points challenging the trial court's action in denying judgment for breach of contract, and violations of the D.T.P.A. Lastly, Commonwealth argues that because judgment was denied for breach of contract, Downs has failed to establish any liability on the part of Commonwealth, and this precludes liability under the Insurance Code. Accordingly, it is appropriate to address whether Downs proved that the damage to his arena roof was covered under the terms of the policy.

First, however, we must consider Commonwealth's contention that Downs may not now complain in his cross-point of the trial court's action regarding the breach of contract action, because the judgment signed by the trial court was in fact the proposed judgment that was submitted by Downs, and "it stretches the bounds of credibility that appellee is now arguing that the trial court erred in awarding a judgment which appellee himself urged upon the trial court."

Downs' two cross-points are not phrased so as to request that this court affirm the judgment on the alternative causes of action if the judgment cannot be affirmed on the causes of action for breach of the duty of good faith and fair dealing, and Insurance Code violations. Nonetheless, in his prayer in his brief Downs requests that the judgment be affirmed, or alternatively, reformed so as to award Downs the most favorable relief to which he may be entitled.

We disagree with Commonwealth that Downs has waived his right to complain of the trial court's action in denying judgment on the alternative causes of action. The case of *Boyce Iron Works v. S.W. Bell Telephone,* 747 S.W.2d 785 (Tex.1988), is instructive in this matter. In *Boyce,* the Texas Supreme Court held that when a party tries a case on alternative theories of recovery, and the jury returns favorable findings on two or more theories, the prevailing party has a right to a judgment on the theory entitling him to the greatest or most favorable relief under case law and Tex.R.Civ.P. 301. *Id.* at 787. Further, that party may seek recovery under an alternative theory if the judgment is reversed on appeal, and there is no need for the prevailing party to complain in the trial court of a favorable judgment that is based on one of alternative causes of action. *Id.*

Accordingly, we find that Downs may challenge the court's action in denying judgment for breach of contract, and violations of the D.T.P.A. Because the facts pertaining to all four causes of action are identical, and because judgment was awarded to Downs on his claim that Commonwealth breached its duty of good faith and fair dealing in the underwriting, investigating, processing, and denial of coverage, we must initially determine whether the cause of the property damage was a covered peril under the terms of the insurance contract.

## BREACH OF CONTRACT

Jury Question 2 asked the jury to find from a preponderance of the evidence "that weather conditions listed under Plaintiff's insurance policy were the dominant cause of the collapse of Plaintiff's arena." The jury answered affirmatively.

In its first point of error, Commonwealth contends the evidence is legally and factually insufficient to support the jury's affirmative answer to Question No. 2, that weather conditions listed under Downs' insurance policy were the dominant cause of the collapse of Downs' arena. Accordingly, Commonwealth asserts the evidence is insufficient to establish that it breached the insurance contract by denying coverage. In his first cross-point, Downs contends the trial court erred in denying judgment for breach of contract.

It is well established that an insured cannot recover under an insurance policy unless facts are pleaded and proved showing that damages are covered by the insured's policy. *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex.1988) (opinion on reh'g).

As set out earlier in this opinion, the insurance policy provided coverage for damage caused by hail, but not for damage caused by rain or snow. There is no mention in the policy of ice or sleet; nor is there a definition of hail. The parties agree that the damage to Downs' arena was caused by an accumulation of ice. Downs' contentions are that the accumulated ice was caused by ice pellets or sleet, which come within the commonly understood definition of "hail," and that the policy is ambiguous because it specifically covers hail, and only rain and snow (not sleet) are specifically excluded. Commonwealth has consistently maintained that the ice pellets which accumulated on the roof of the arena did not come within the accepted definition of "hail"; therefore, this named-perils policy did not provide coverage for the damage sustained by Downs.

Generally, insurance policies are contracts and as such are controlled by rules of construction which are applicable to contracts generally. *Upshaw v. Trinity Companies*, 842 S.W.2d 631, 633 (Tex. 1992); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex.1987). If the written instrument is worded so that it can be given only one reasonable construction, it will be enforced as written. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984). If a contract of insurance is susceptible to more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured. *National Union v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991). This is especially true when we are dealing with exceptions and words of limitation in the insurance policy. *Kelly Assoc. v. Aetna Cas. & Sur. Co.*, 681 S.W.2d 593, 596 (Tex.1984). An intent to exclude coverage must be expressed in clear and unambiguous language. *Nation-*

*al Union*, 811 S.W.2d at 555. These special rules favoring the insured are only applicable where there is an ambiguity in the policy. *Puckett*, 678 S.W.2d at 938. A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983). Interpretation of a contract becomes a fact issue to be resolved by extrinsic evidence only when application of pertinent rules of construction leaves a genuine uncertainty as to which of two meanings is proper. *Id.* at 394; *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1979).

After examining the entire insurance policy, we conclude that because the term "hail," as used in the policy, is susceptible to more than one reasonable construction, an ambiguity existed. Accordingly, extraneous evidence was properly introduced at trial so as to determine the intended meaning of the term "hail," and whether Downs' property damage fell within the policy coverage.

In an attempt to equate the two conditions of hail and sleet, Downs recognizes there are no Texas cases directly on point. Without any further analysis or discussion, Downs urges us to adopt the reasoning of *Evana Plantation v. Yorkshire Ins. Co.*, 214 Miss. 321, 58 So.2d 797 (1952), and *Southall v. Farm Bureau Mut. Ins. Co.*, 276 Ark. 58, 632 S.W.2d 420 (1982), both of which held that sleet was included within the policy coverage for "hail."

In *Evana*, the question was whether damage caused by sleet to the roof of an insured building was covered within the terms of an insurance contract which provided coverage for "hail," but which specifically excluded damage by ice from the hail coverage. *Evana*, 58 So.2d at 797. The court quoted three separate dictionary definitions of hail and sleet, and mentioned that the contract itself undertakes to define "hail" by stating what the term does not include. *Id.* at 800. The court opined that if the excluded word "ice" was construed literally, it would automatically invalidate the insuring clause which covers hail, and the insurance company did not write a poli-

cy covering hail and then by an exception exclude hail. *Id.* at 800–01. The court noted that the testimony as to the physical distinctions between small hail, soft hail, and sleet indicates at least as many similarities as dissimilarities, and this is persuasive regarding the contractual meaning of "hail." *Id.* at 801. After citing the established rules of construction of insurance contracts, the court concluded that the clause in question, as defined within the term of the insurance contract, placed the loss from sleet within the coverage of perils from "hail." *Id.* at 800–01.

In *Southall,* the Supreme Court of Arkansas was faced with the issue of whether an insurance policy covering loss caused by hail included loss caused by sleet. *Southall,* 632 S.W.2d at 421. The insurance policy covered loss caused by hail, but specified that "[t]his Company shall not be liable for loss caused directly or indirectly by (a) frost or cold weather or (b) ice (other than hail)." *Id.* At trial, there was undisputed testimony that the word "hail" includes large hail, small hail, winter hail, and sleet. *Id.* A witness employed by the Weather Service testified that hail is so defined in a recognized meteorological dictionary. *Id.* Further, the appellate court mentioned that a commonly used dictionary (albeit copyright 1939) subdivides hail into summer hail and winter hail. *Id.* The court also cited the *Evana* case as being directly in point, and noted that the insurer's vice president in *Southall* conceded at trial that the sleet on the roof of the insured building was small hail. *Id.* Accordingly, the supreme court held the trial court erred in instructing the jury that the term "hail" as used in the policy should be given the meaning ordinarily applied to that term in the everyday affairs of life, and should have instructed the jury that the word "hail" as used in the policy included sleet. *Id.* at 421–22.

We find both of these cases distinguishable from the case at bar. An important distinction is that the insurance contracts in both *Evana* and *Southall* specifically excluded ice from the coverage for hail, whereas there is no such exclusion in Downs' policy. In *Southall* there was undisputed testimony that "hail" includes sleet, and that the sleet on the roof was small hail. Although it is agreed by the parties that Downs' roof was damaged by an accumulation of ice, there were many conflicting opinions at trial regarding whether the ice was actually "hail." Because of these factual differences, we decline to summarily adopt and apply the reasoning of *Evana* and *Southall* to the instant case.

In our analysis of whether the policy interpretation advanced by Downs is a reasonable one, we shall detail the evidence presented at trial concerning the terms of the insurance policy, and the cause of the damage to Downs' arena.

Downs' trial strategy was to convince the jury that the meaning of the word "hail" should be as defined by The American Heritage Dictionary: "Precipitation in the form of pellets of ice and hard snow."[1] Downs testified that he was not in Cooke County during the period January 5 through 7, 1988, but that he investigated the damage to his arena as soon thereafter as he was able to drive to his ranch. In Downs' opinion the damage to the arena was caused primarily by ice accumulating on the roof—sleet, freezing rain, and snow solidified into ice because of the low temperatures. Downs stated his belief that hail means "little pellets of ice falling from the sky, usually in the context of a storm," and sleet is "a frozen rain, droplets of rain that are frozen." He gave his opinion that the difference between hail and sleet is the size: hail is in the form of pellets, whereas sleet is tiny droplets. Downs stated his understanding that the term "hail" in his policy also protected him against damage from sleet.

Prentis Preston is the owner of Wilson Land Company in Sanger, Texas, a real estate brokerage firm. Preston testified he is the local property manager for Downs, and on January 9, 1988, he investi-

---

1. The trial court refused to admit into evidence the dictionary itself, sustaining Commonwealth's objection that the book was copyrighted.

gated the damage to Downs' arena. Preston stated that the roof of the arena was laying flat on the ground and was covered with thick broken sheets of ice or frozen sleet. Preston defined both hail and sleet as frozen ice pellets, and opined that sleet occurs during winter and is smaller than hail which does not occur in winter, but is seen primarily in spring and summer.

Bernice Trimball, testifying on behalf of Downs, stated she is the National Weather Service Observer for Gainesville, Texas. Trimball said that as a weather observer she measures rainfall and the accumulation of snow, ice, and sleet for the National Weather Service. On January 6, 1988, she measured the accumulated precipitation in Gainesville; in order to do so, she had to chip through the ice, which was composed of sleet. According to Trimball's measurements, in Gainesville on January 6, 1988, there was no measurable amount of snow, the rainfall or liquid measurement was 1.15, and the total sleet accumulation was 4.5 inches.

Commonwealth disputed that the accumulation of ice on Downs' arena resulted from hail. James Hayes, Commonwealth's adjuster who handled Downs' claim, stated his opinion that hail is a form of frozen rain, whereas sleet is partially frozen rain. He acknowledged that both hail and sleet are in the form of ice pellets. When asked if he disagreed with the dictionary definition of hail as precipitation in the form of pellets of ice and hard snow, he responded, "No, not necessarily." He stated that in his opinion, hail is much harder and generally larger than sleet, and usually frozen sleet is softer and not quite frozen as hard as hail. In a persistent attempt by Downs' counsel to get Hayes to admit that the policy covers *all* accumulations of ice pellets, whether originating from hail or from sleet, the following dialogue transpired:

Q. [By Downs' counsel] Is it not a fact that your policy covers ice pellets and the accumulation of ice pellets?

A. Yes, if you want to consider hail as ice pellets.

Q. But you've told me that hail is an ice pellet, have you not?

A. It is a frozen form of ice, yes.

Q. You have told me that hail is an ice pellet, have you not?

A. Yes, okay, it is.

Q. So your policy covers ice pellets?

A. All right. It covers ice pellets.

Q. And sleet is also an ice pellet, is it not?

A. Yes.

Q. So now you're telling the ladies and gentlemen of the jury that this policy that we have been having the fight about for 15 or 18 months, actually provides coverage for the very claim that Dr. Downs learned about, are you not?

[Commonwealth's counsel]: I'll object to that, Your Honor, that's not the— that's mischaracterization of this witness' testimony, and it's improper.

THE COURT: Sustain the objection.

Q. [By Downs' counsel] Would you agree, sir, now that you've heard all this evidence, that you would now interpret the policy to cover collapse due to sleet?

A. No, I do not.

Q. But you would agree that the policy would provide coverage for collapse due to accumulation of ice pellets?

A. Yes.

Q. But sleet is an ice pellet, is it not?

A. Yes.

Q. So, therefore, your policy covers a loss due to the accumulation of sleet?

A. That's not the way the policy is worded. . . .

On examination by Commonwealth, Hayes stated that hail is a hard frozen form of rain which is a warm weather phenomenon associated with thunderstorms, is never seen in January, and normally leaves some sort of damage ("a skuff [sic] mark or some taletelling effect on the building"). On the other hand, sleet is small partially frozen raindrops which do not leave the marks or same effect on a building as does hail.

Dale Milford is a certified meteorologist who testified on behalf of Commonwealth. Milford stated that contrary to common usage, meteorologically speaking there is no such weather condition known as

"sleet." He explained that "[s]leet means many things to many people. Some people call it a mixture of rain and snow, sleet. Others call hail sleet. Others call ice pellets sleet." He stated that an ice pellet is a frozen raindrop that is never larger than a raindrop would be when it is frozen, whereas hail consists of many, many raindrops that are frozen in successive trips up and down the clouds.

Milford gave an extensive explanation of the atmospheric conditions which must occur to produce hail and those which must be present to generate sleet or freezing rain. He testified that different atmospheric conditions are present when sleet or freezing rain fall.[2] Milford stated that hail is a phenomena that is produced by a violent uplifting of moisture-laden air. It takes place when you have contrasting air masses of rather widely different temperatures, one of which must contain moisture. It is the type of pattern that is observed primarily in the springtime and in fall, and to some degree in summer. If you have a cold air mass that is moving, and it is being apposed by another air mass that is warm and humid, the warmer air is going to rise up above the cold air. The warm air is then lifted violently by the cold air, and will cool at a rate of approximately five degrees every 1,000 feet. The cooling of the air will make the moisture in the air condense, and a cloud will form. If the lifting is violent enough the cloud will grow and "boil," and as is often seen in the spring or summertime, big dark cumulus clouds form as the result of very violent updrafts and downdrafts of air. As that air is violently lifted, the water first condenses as a raindrop. As it is carried up into the freezing level, that raindrop freezes and eventually falls, and in doing so it will counteract or join with other raindrops and get caught by other violent lifting, and be carried again to the freezing level.

Hail is not present in wintertime because it cannot form, the reason being that when the surface temperature is at freezing or below, instead of making the uplift, when the water is lifted it freezes and becomes an ice pellet or sleet, and since there is no liquid water present it cannot produce hail. Milford testified that if you take a hailstone and cut it in half, it will look like rings of a tree where each time it has collided with another drop and grown in size. This hailstone eventually reaches sufficient weight that the air currents can no longer hold it up, so it falls to the ground as hail.

According to Milford's analysis, the temperature in Cooke County between January 5th and 7th, 1988, at the various levels of the atmosphere, was such that any lifting that would have occurred would have produced a frozen raindrop that would never have an opportunity to develop in size. He stated his opinion that based on his experience and training as a meteorologist, and his review of the records obtained from the National Weather Service, the weather conditions during that time period were not such that could have produced hail. Milford concluded that the precipitation which occurred consisted of either ice pellets or freezing rain.

In his brief, Downs states that at trial his counsel asked three of Commonwealth's witnesses whether they agreed with the dictionary definition of hail as "precipitation in the form of pellets of ice and hard snow," and none of the three disagreed. Adjuster Hayes testified he did not necessarily disagree with the dictionary definition of hail, but he definitely disagreed with Downs' contention that the ice pellets which accumulated on the roof of Downs' arena were a named peril covered under the policy. Meteorologist Milford testified that from a meteorological viewpoint he disagreed with the dictionary definition of hail, and he was not competent to respond to the question of what was the general usage definition. Tracy McWhorter, the customer service representative for the William Rigg Insurance agency in 1986, testified it was her responsibility to place coverage for customers and deal with all of the company's underwriting guidelines.

2. The witness was drawing on a blackboard as he described these various weather conditions; unfortunately, on appeal we do not have the benefit of this visual aid.

As will be elaborated upon later in this opinion, McWhorter procured the coverage from Commonwealth for Downs' ranch. When asked by Downs' counsel whether she disagreed with The American Heritage Dictionary definition of hail, she responded "not hardly." When asked if she agreed with the same dictionary's definition of sleet as "a mixture of rain and snow or hail," she responded she wasn't going to argue with the dictionary.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988) (per curiam); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951) (per curiam). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate*, 244 S.W.2d at 661–62.

Downs attempted to equate the covered peril, hail, with the existing weather conditions, sleet or ice pellets. The witnesses had varying viewpoints regarding a dictionary definition of hail offered by Downs' counsel: precipitation in the form of pellets of ice and hard snow. Although the witnesses stated differing opinions about the weather conditions in Cooke County at the time the arena roof collapsed, their testimony was that the conditions consisted of either ice, freezing rain, snow, or "sleet," or a combination of these weather conditions. In fact, *none* of the witnesses, including Downs, testified that the precipitation which fell during the pertinent time period was actually "hail."

Considering only the evidence and inferences in support of the jury's answer to Jury Question 2, we find no evidence of probative force to support the jury's finding. Accordingly, we hold the damage to the arena roof was not covered under the terms of the insurance policy. We sustain Commonwealth's first point of error, and overrule Downs' first cross-point.

## INSURANCE CODE and D.T.P.A. VIOLATIONS

In its second point of error, Commonwealth complains: there was no evidence, or insufficient evidence, that it knowingly violated article 21.21 of the Texas Insurance Code, or the D.T.P.A.; and the four related jury questions were so vague and incomprehensible as to be violative of due process.

*Jury Question No. 4* read as follows:

Do you find from a preponderance of the evidence that Defendant engaged in any unfair or deceptive act or practice that was a producing cause of damages to Plaintiff?

You are instructed that "unfair or deceptive act or practice" means any of the following:

(A) engaging in any false, misleading, or deceptive acts or practices.

"False, misleading, or deceptive act or practice" means an act or series of acts that have the tendency to deceive an average ordinary person, even though that person may have been ignorant, unthinking or gullible; or

(B) making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy; or

(C) making or causing directly or indirectly causing to be made, any assertion, representation, or statement with respect to insurance that was untrue, deceptive, or misleading.

*Jury Question No. 13* asked:

Do you find from a preponderance of the evidence that Defendant engaged in any "false, misleading or deceptive act or practice" that was a producing cause of damages to Plaintiff?

"False, misleading or deceptive act or practice" means any of the following:

(A) representing that goods or services had or would have characteristics or benefits that they did not have; or

(B) representing that goods or services are or will be of a particular standard, quality or grade if they were of another;, [sic] or

(C) representing that an agreement confers or involves rights and remedies it did not have or involve; or

(D) failing to disclose information about goods or services that was known at the time of the transaction with the intention to induce another into a transaction; or

(E) failing to attempt in good faith investigate, process and pay the claim promptly, fairly and equitably when liability has become reasonably clear.

In Jury Questions 6 and 16 the jury was asked whether the acts or practices referred to in Questions 4 and 13 were committed "knowingly." The jury answered Questions 4, 6, 13, and 16 affirmatively.

### Relevant Statutes

*Insurance Code:*

Section 3 of article 21.21 provides that "[n]o person shall engage in this state in any trade practice which is defined in this Act as, or determined pursuant to this Act to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." TEX.INS.CODE ANN. art. 21.21, § 3 (Vernon 1981).

These prohibited unfair methods of competition or unfair or deceptive acts or practices are defined in section 4 of article 21.21, as follows:

(1) **Misrepresentations and False Advertising of Policy Contracts.** *Making, issuing, circulating, or causing to be made, issued or circulated, any* estimate, illustration, circular or *statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby* or the dividends or share of the surplus to be received thereon, or making any false or misleading statements as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any

misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance;

(2) **False Information and Advertising Generally.** *Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made,* published, disseminated, circulated, or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, *an* advertisement, announcement or *statement containing any assertion, representation or statement with respect to the business of insurance* or with respect to any person in the conduct of his insurance business, *which is untrue, deceptive or misleading.*

*Id.* § 4(1), (2) (Vernon Supp.1993) (emphasis added).

Section 16 of article 21.21 provides:

(a) Any person who has sustained actual damages as a result of another's engaging in an act or practice declared in *Section 4 of this Article or in rules or regulations lawfully adopted by the Board under this Article* to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance *or* in any practice defined by *Section 17.46 of the Business & Commerce Code,* as amended, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices.

*Id.* § 16(a) (Vernon Supp.1993) (emphasis added).

Article 21.21–2 of the Texas Insurance Code provides in pertinent part as follows:

### Prohibited practices

Sec. 2. No insurer doing business in this state ... shall engage in unfair claim settlement practices. Any of the following acts by an insurer, if committed without cause and performed with

such frequency as determined by the State Board of Insurance as provided for in this Act, shall constitute unfair claim settlement practices:

. . . .

(d) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability has become reasonably clear. . . .

*Id.* art. 21.21–2, § 2(d) (Vernon 1981) ("Unfair Claim Settlement Practices Act").[3]

*Deceptive Trade Practices Act:*

Section 17.46 of the D.T.P.A., as applied to the facts of this case, provides that a consumer may recover damages for the following "false, misleading, or deceptive acts or practices" including: representing that *goods or services have characteristics or benefits that they do not have* ((b)(5)); representing that *goods or services are of a particular standard, quality, or grade, if they are of another* ((b)(7)); representing *that an agreement confers or involves rights or remedies which it does not have or involve* ((b)(12)); and *failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed* ((b)(23)). TEX.BUS. & COM.CODE ANN. § 17.46(b)(5), (7), (12), (23) (Vernon 1987).

The D.T.P.A. further provides in section 17.50:

(a) A consumer may maintain an action where any of the following constitute a producing cause of actual damages:

(1) the use or employment by any person of a false, misleading, or deceptive act or practice that is specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter;

. . . .

(3) any unconscionable action or course of action by any person; or

(4) the use or employment by any person of an act or practice in violation of Article 21.21, Texas Insurance Code, as amended, or rules or regulations issued by the State Board of Insurance under Article 21.21, Texas Insurance Code, as amended.

*Id.* § 17.50(a)(1), (3), (4) (Vernon 1987).

*The form of the jury questions:*

Commonwealth asserts that Jury Questions 4, 6, 13, and 16 are so vague and incomprehensible as to be violative of due process. Although Commonwealth's point of error challenges the wording of Questions 6 and 16, no argument is presented regarding Commonwealth's contention. Because Commonwealth has not complied with TEX.R.APP.P. 74(f), no error is presented regarding the wording of Questions 6 and 16. We find that Questions 4 and 13 were properly worded for the following reasons:

Question 4(A) pertains to a violation of article 21.21, section 16, and is taken from *Spradling v. Williams,* 566 S.W.2d 561, 562 (Tex.1978), which was cited with approval in *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129, 135 (Tex.1988). *Vail* held that article 21.21, section 16 incorporates D.T.P.A. section 17.46, which "encompasses *any* type of business activity that deceives consumers" and is not limited to the practices specifically listed in section 17.46(b). *Vail,* 754 S.W.2d at 135.

Question 4(B) is taken from article 21.21, section 4(1).

Question 4(C) is taken from article 21.21, section 4(2).

Regarding the "false, misleading or deceptive act or practice" defined in Question 13, subparts (A) through (D) track the statutory language of D.T.P.A. section 17.46(b)(5), (7), (12), and (23), respectively.

Subpart (E) of Question 13 stated that a "false, misleading or deceptive act or practice" is "failing to attempt in good faith

---

**3.** This section was revised somewhat and renumbered in 1991. *See now* TEX.INS.CODE ANN. art. 21.21–2, § 2(b)(4) (Vernon Supp.1993).

[to] investigate, process and pay the claim promptly, fairly and equitably when liability has become reasonably clear." Question 13(E) pertains to actions on the part of Commonwealth after Downs filed a claim under the insurance policy. In view of our finding that the damage to the arena was not covered under the terms of the policy, there can be no award of damages under Question 13(E), and we need not address whether Question 13(E) was correctly worded, or whether the evidence supported the jury's finding.

We find jury Questions 4 and 13(A–D) were not so vague and incomprehensible as to be violative of due process, and we overrule that portion of Commonwealth's second point of error which makes this contention.

*Sufficiency of the evidence:*

■ We next address the sufficiency of the evidence to support the jury's affirmative answers to the questions concerning violations of the Insurance Code and the D.T.P.A.

Question 13(E) has been addressed above. The jury's answers to Questions 4 and 13(A–D) pertain to allegedly unfair, false, misleading, or deceptive actions taken by Commonwealth during the procurement phase of the policy.

Both parties agree that Downs desired insurance coverage on his property that corresponded with the insurance clause in the lease he had with his tenant. As set out verbatim earlier in this opinion, the lease required Downs to "insur[e] the building against loss or damage by fire, explosion or other hazards and contingencies." The insurance provided by Commonwealth insured against the following conditions: fire and lightning; smoke; windstorm, hurricane and hail; explosion; aircraft and vehicles; and riot and civil commotion. Each of these coverages contained one or more exclusions. An endorsement was added providing coverage for vandalism and malicious mischief.

Downs testified that through his administrative assistant he provided Commonwealth with a copy of the signed lease, and requested coverage based on the state-

ments in the lease documents. Downs stated unequivocally that the requirement that the insurance policy comply with the terms of the lease constituted his entire request for insurance as far as coverage was concerned. Within thirty days after the original policy was sent to him by Commonwealth, Downs "glanced" at the policy because he "wanted to see if it was—what, basically, I thought it was in terms of an insurance policy." He stated he thought it was a policy for fire and "extended coverage," meaning "natural disasters, save acts of God or eminent domain or something like that that was totally unpredictable." After reviewing the policy, Downs concluded the policy met his request.

Upon cross-examination, Downs agreed that a contract is something that a person ought to read and understand before it is entered into. Downs acknowledged he is a licensed physician who has been involved in a number of business ventures that are unrelated to the practice of medicine, including three real estate investments in Texas. He admitted that as a result of his real estate investments, he has had many opportunities to review and look over documents closely and in detail, including insurance contracts.

Tracy McWhorter testified that she worked at the William Rigg Insurance Agency as a customer service representative, and she handled the insurance request from Downs. She stated that Downs' administrative assistant asked her to write a fire and extended coverage policy. McWhorter's qualifications include possessing an inactive solicitor's license, and a Class 2 and Class 4 adjuster's license from the Texas State Board of Insurance. She stated that as both a solicitor and an adjuster she has learned what comes within the term "extended coverage of perils," and this means "[f]ire and lightning, smoke, windstorm, hurricane and hail, explosion, aircraft and vehicles, riot and civil commotion." McWhorter testified that after she furnished a copy of the policy to Downs or his administrative assistant, she never received any complaints, requests, or applications from Downs to write the policy

differently, to endorse the policy, or to somehow change the coverage. Further, neither Downs nor his administrative assistant ever expressed any dissatisfaction with the coverage provided by the William Rigg Agency.

After considering only the evidence and inferences which tend to support the jury's answers to Questions 4 and 13, we find no evidence Commonwealth engaged in any unfair or deceptive act or practice, as defined in those questions. The evidence established that the insurance coverage which was provided by Commonwealth satisfied the requirements of the lease. There was never any suggestion at trial or on appeal that anyone connected with either the William Rigg Insurance Agency or with Commonwealth made any representations to Downs or to his administrative assistant about the extent of insurance coverage, other than that the coverage which was provided satisfied the requirements of the lease. We sustain that portion of Commonwealth's second point of error which challenges the legal sufficiency of the evidence to support Questions 4 and 13. We hold the trial court erred in rendering judgment in favor of Downs on his cause of action for violations of section 21.21 of the Texas Insurance Code. We overrule Downs' second cross-point which alleges error in denying judgment for violations of the D.T.P.A.

## DUTY OF GOOD FAITH AND FAIR DEALING

The trial court awarded judgment to Downs based upon his cause of action for breach of the duty of good faith and fair dealing. The elements of this cause of action were set forth in *Arnold v. National Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1987), and *Aranda v. Insurance Co. of N. America*, 748 S.W.2d 210 (Tex.1988). In *Arnold*, the Texas Supreme Court recognized that an insurer owes its insured a duty of good faith and fair dealing in handling claims. *Arnold* held that a cause of action for breach of this duty is stated when the insured alleges that there is no reasonable basis for denial of a claim or delay in payment, or a failure on the part of the insurer to determine whether there

is any reasonable basis for the denial or delay. *Arnold*, 725 S.W.2d at 167. In *Aranda*, this duty was extended to workers' compensation carriers who have a duty to deal fairly and in good faith with an injured employee in the processing of compensation claims. *Aranda*, 748 S.W.2d at 212–13.

In the case at bar, Jury Question 8 inquired as follows:

Do you find from a preponderance of the evidence that Defendant did not act in good faith in its dealings with Plaintiff during the underwriting, investigating, processing and denial of coverage?

You are instructed that "good faith" is defined as "honesty in fact in the conduct or transaction concerned."

You are instructed that a cause of action for breach of the duty of good faith and fair dealing is stated when it is alleged that the Defendant did not issue the type of insurance policy requested and which was agreed to be provided or when there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay.

You are instructed that the Defendant is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business.

The jury answered this question affirmatively.

In view of our holding that the damage sustained by Downs is not covered under the insurance policy, the jury's answer to Question 8 cannot be upheld on failure of Commonwealth to act in good faith during the investigating, processing, and denial of coverage.

Regarding Commonwealth's failure to act in good faith in its dealings with Downs during the *underwriting* phase of the transaction, Commonwealth's sixth point of error challenges the legal and factual sufficiency of the evidence to support the jury's affirmative answer to Question

8, and in point of error seven Commonwealth asserts error in the inclusion in Question 8 of any reference to the underwriting portion of the transaction with Downs.

Downs acknowledges that the Texas Supreme Court in *Arnold* and *Aranda* did not address other potential areas of breach of the duty of good faith, such as underwriting. He cites no authority for his theory that he may maintain a cause of action for breach of the duty of good faith and fair dealing in the underwriting portion of the transaction. Downs' contention is that the Texas Supreme Court's holdings in *Arnold* and *Aranda* did not foreclose the application of such a duty to additional areas of insurance transactions, and these decisions do not state that other types of misconduct would not be actionable in an appropriate case.

Without the benefit of supporting authority or convincing rationale, we decline to extend the duty of good faith and fair dealing to cover the underwriting phase of an insurance transaction. Therefore, we hold this is not a viable cause of action, and that portion of Question 8 inquiring about underwriting should not have been submitted to the jury. Because we have found the damage to Downs' building was not covered under the terms of the insurance policy, there was no evidence to support the remainder of Question 8, regarding a lack of good faith in the investigating, processing, and denial of coverage. Accordingly, we hold that Question 8 cannot support an award to Downs for breach of a duty of good faith and fair dealing, and we sustain Commonwealth's sixth and seventh points of error.

In points of error five and eight, Commonwealth maintains the trial court erred in awarding judgment for alleged violations of the Texas Insurance Code, and for breach of the duty of good faith and fair dealing because: as a matter of law there was a legitimate factual issue and a legitimate legal dispute concerning the facts and circumstances of Downs' claim and the policy coverage provided by Commonwealth; and there was an absence of any contract recovery by Downs, and no determination of Commonwealth's liability upon the insurance policy. We sustain these points of error in view of our holding that there was no evidence that Downs was entitled to recover under the insurance policy.

Commonwealth's points of error three, four, nine, and ten deal with alleged error pertaining to actual and exemplary damages awarded to Downs. Because we have held that Downs may not recover on any of his four pleaded causes of action, we need not address these points of error.

We reverse the trial court's judgment, and render judgment that Downs take nothing against Commonwealth on any of his asserted causes of action.