**CITY OF FORT WORTH, Appellant,**

v.

**Cynthia DeOREO, Appellee.**

**No. 2–02–207–CV.**

Court of Appeals of Texas,
Fort Worth.

July 31, 2003.

Theodore P. Gorski, Jr., Elizabeth Dierdorf, Carolyn J. McFatridge, Asst. City Atty's., City of Fort Worth, for Appellant.

Law Offices of Art Brender, Jason C.N. Smith, Art Brender, Fort Worth, for Appellee.

Panel A: DAY, LIVINGSTON, and DAUPHINOT, JJ.

## OPINION

SAM J. DAY, Justice.

### I. INTRODUCTION

Appellant, the City of Fort Worth, appeals the trial court's judgment for Appellee, Cynthia DeOreo, on her claims for violations of the Texas Whistleblower Act (Act). In eleven issues, Appellant complains that: 1) Appellee failed to state a claim under the Act; 2) even if a claim was stated under the Act, the evidence was legally and factually insufficient to prove the elements of a whistleblower cause of action; and 3) the evidence was legally and factually insufficient to support the compensatory damages award. We affirm the trial court's judgment.

### II. FACTS

Appellee was employed by Appellant as a police officer from March 1992 until June 2000. In May of 1996, Appellee reported her ex-husband and fellow police officer, Tim Harkrider, to the Fort Worth Police Department for aggravated kidnaping. Appellant discharged Harkrider when he pled guilty to felony false imprisonment. While Harkrider worked as a police officer, he and deputy chief of police Ralph Mendoza were friends. In August of 1999, Mendoza was appointed to chief of police for Appellant.

Appellee alleged that after Mendoza became chief of police, seven separate instances of retaliation occurred against her for reporting Harkrider's illegal conduct. After the seventh alleged retaliation event, Appellee resigned from the police department. Appellee then filed suit on August 11, 2000 claiming constructive discharge in violation of the Act, sexual harassment in violation of section 21.051 of the Texas Labor Code, and retaliation for opposing unlawful sex discrimination in violation of section 21.055 of the Texas Labor Code. Appellant moved for a summary judgment motion on Appellee's claims. The trial court granted the summary judgment in part, and Appellee proceeded to trial solely on her whistleblower claim. Appellee's claim was tried to the bench, and the trial court found in favor of Appellee on that claim. The trial court then awarded Appellee nearly $100,000 in damages against Appellant. The trial court further ordered Appellant to reinstate Appellee to a position comparable to that which she held on the day she was constructively discharged.

## III. TEXAS WHISTLEBLOWER ACT

Appellant alleges that Appellee failed to prove a claim under the Texas Whistleblower Act. Appellant states that Appellee had the burden of proving four elements under the Act: 1) a report of a violation of law; 2) made in good faith; 3) to an appropriate law enforcement authority; and 4) that a suspension, termination, or other adverse personnel action resulted from that report. TEX. GOV'T CODE ANN. § 554.002(a) (Vernon 2003). Appellant claims that Appellee: 1) failed to report a violation of law contemplated by the Act to an appropriate law enforcement authority; 2) failed to possess a good-faith belief that she had reported violations of law; and 3) failed to prove her reports caused an adverse personnel action or a constructive discharge.

### Failure To State A Claim

■ In Appellant's first issue on appeal, Appellant states that the evidence is both legally and factually insufficient to support the finding that Appellee reported in good faith to an appropriate law enforcement entity violations of law by a public official. Appellant states that Appellee never made a report that was protected under the Act. Although Appellant couches this argument in terms of legal and factual sufficiency, whether Appellee reported a violation of law to an appropriate law enforcement authority is a question of law. Therefore, we apply a de novo standard of review. *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 274 (Tex.App.-Fort Worth 2002, no pet.).

Appellant claims that Appellee's reports could not provide Appellee protection under the Act. In support of this argument, Appellant argues that the reporting of an off-duty police officer's illegal activity, which had no connection to his job as a police officer, was not protected under the Act. Appellant further argues that the Texas Labor Code provided Appellee her exclusive remedy for her two sexual harassment reports and, in the alternative, she did not file the reports with the appropriate agency. Appellee responds by stating that the evidence shows that the three reports were protected under the Act.

■ The record shows that the trial court dismissed Appellee's claims under the Texas Labor Code, and Appellee did not appeal this dismissal. Further, the record shows that Appellee only made her report of Officers Riggs' and Walton's alleged violations of the Fort Worth Police Department's sexual harassment policy to Appellant. The Texas Supreme Court has held that a party who wants protection under the Act must report a violation to the proper agency. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 319 (Tex.

2002). The proper agency, in this case, is one that has the authority to regulate under, enforce, investigate, or prosecute a violation of Texas's sexual harassment and employment retaliation statutes. *Id.* This court has held that a city's general authority to regulate under, enforce, and investigate claims of sexual harassment is not enough to make it an appropriate law enforcement authority under the Act. *See City of Weatherford v. Catron*, 83 S.W.3d 261, 268–69 (Tex.App.-Fort Worth 2002, no pet.) (holding as a matter of law that the City is not an appropriate law enforcement authority under section 554.002(b) for the reporting of another employee's violation of federal or state sexual harassment laws). We hold that Appellee's sexual harassment and employment retaliation reports were not reported to the appropriate agency and, therefore, cannot form the basis of a whistleblower retaliation claim under these facts.

■■■ Appellant further alleges that Appellee's report of Harkrider's criminal activity cannot form the basis of a claim under the Act. The basis of Appellant's allegation lies in the fact that neither Harkrider nor Appellee were on duty at the time the crime was committed. As such, Appellant claims that Harkrider's actions did not relate to the affairs of the police department and that our decision in *City of Cockrell Hill v. Johnson* should be expanded to include this set of facts. *City of Cockrell Hill v. Johnson*, 48 S.W.3d 887 (Tex.App.-Fort Worth 2001, pet. denied). We disagree.

In *Johnson*, we held that, because an unpaid public official was not a public employee and the alleged violations of law at issue were committed in the elected public official's personal capacity and did not relate to the affairs of the city itself, the Act did not apply. *Id.* at 896. In this case, Harkrider was a paid city employee. Fur-

ther, the fact that both Harkrider and Appellee were police officers weighs in heavily on our decision.

The evidence shows that Appellee acted in her official capacity as a police officer when she made the report because police officers are on duty 24 hours a day. *See Turnage v. JPI Multifamily, Inc.*, 64 S.W.3d 614, 621 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (holding that police officers have a duty to prevent crime and arrest offenders 24 hours a day, and that a public duty is triggered any time an officer observes a crime, even outside the hours of his official work). Appellee witnessed a felony being committed in this case, and while it is true that she was the victim of the felony, this fact does not strip Appellee of her public duty to arrest the offender.

We also rely on a decision made by the Austin Court of Appeals in determining that the reporting of a criminal violation committed by an off-duty police officer is protected under the Act. *City of San Antonio v. Heim*, 932 S.W.2d 287 (Tex.App.-Austin 1996, writ denied). In *Heim*, a police officer alleged that his superiors retaliated against him for arresting an off-duty police officer for driving while intoxicated. *Id.* at 289. The court held that the alleged criminal act of DWI, if true, was a violation of the arrested officer's official duty as a police officer to obey as well as enforce the law. *Id.* at 290. Here, Harkrider pled guilty to aggravated kidnaping which is, of course, a violation of Harkrider's official duty as a police officer to obey as well as enforce the law. *Id.* Therefore, we hold that Harkrider was a public employee and he violated his official duty to obey as well as enforce the law when he committed aggravated kidnaping. It is undisputed that Appellee's report of Harkrider's conduct to the Fort Worth Police Department was made to an appropriate law enforcement authority. Therefore,

Appellee's report of Harkrider was protected under the Act. We overrule Appellant's first issue on appeal.

## IV. SUFFICIENCY OF THE EVIDENCE

In Appellant's issues two through six and nine through eleven, Appellant states that the evidence was legally and factually insufficient to prove the elements of a whistleblower cause of action. Specifically, Appellant challenges the legal and factual sufficiency of the evidence to support the finding that there was a good faith report of a violation under the Act, that a report of a violation under the Act caused Appellee's damages, and that Appellee suffered a constructive discharge in this case.

### A. Good Faith

■ In Appellant's second issue on appeal, Appellant alleges that there was no evidence or legally insufficient evidence to prove that Appellee reported a violation of law in good faith. Appellant, however, stipulated to this fact at trial, and Appellee read the stipulation into the record. The stipulation states "the parties have stipulated to the following: That Cynthia DeOreo made a good faith reporting of a violation of law in May 1996, when she reported to the Fort Worth Police Department that her ex-husband, Tim Harkrider, Fort Worth Police officer, had assaulted her." Appellant has, therefore, waived any challenge as to this finding. We overrule Appellant's second issue on appeal.

### B. Causation

■ In Appellant's third through sixth and ninth through eleventh issues, Appellant claims that the evidence is both legally and factually insufficient to support the finding that the Harkrider report caused any of the instances of retaliation that Appellee complains of, or, in the alternative, Appellant claims that these reports failed to show that Appellee suffered intolerable working conditions which caused a constructive discharge.

■ In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002).

■ A "no-evidence" issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999).

■ To prove causation in a whistleblower case, an employee need not prove that her reporting of the illegal conduct

was the sole reason for the employer's adverse action. *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 636 (Tex. 1995); *City of Fort Worth v. Zimlich,* 975 S.W.2d 399, 406 (Tex.App.-Austin 1998), *rev'd in part on other grounds,* 29 S.W.3d 62 (2000). Rather, to show causation, a public employee must demonstrate that after he or she reported a violation of law, in good faith, to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his or her employer that would not have occurred when it did had the report not been made. *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 67 (Tex.2000); *Hinds,* 904 S.W.2d at 637. This causation standard has been described as a "but for" causal nexus requirement. *See Tex. Natural Res. Cons. Comm'n v. McDill,* 914 S.W.2d 718, 723 (Tex.App.-Austin 1996, no writ).

 Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of the illegal conduct. *Zimlich,* 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.; Cazarez,* 937 S.W.2d at 451. But evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more. *Zimlich,* 29 S.W.3d at 69.

Appellee alleges, as her first example of retaliation, that in November of 1999, Appellant denied her request to attend DWI instructor school. The evidence at trial showed that police officers who were not in the DWI unit were given the opportunity to go to the school. The evidence further shows that as a known prerequisite for the course, Appellee was required to take a basic police officer instructor course. In response to Appellee's request to attend the DWI instructor school, Appellee's superiors attempted to send Appellee to the prerequisite course. Due to scheduling conflicts, however, Appellee failed to take that course. Therefore, she failed to qualify to attend the DWI Instructor School.

At trial, Appellee claimed that officers who might have had less seniority or experience than she had were allowed to attend DWI instructor school while she was not. Appellee never claimed, however, that any of these officers lacked the basic training prerequisites for the school that she did. Therefore, Appellee provided no evidence that her filing of the Harkrider report caused Appellant to treat her application for the DWI Instructor School differently than any other officer's.

The next instance of retaliation allegedly occurred on January 6, 2000. On that day, Appellee was sitting in a briefing room while a group of officers including Officer Riggs, Sergeant Peoples, Sergeant Maldonado, and Officer Hernandez were sitting in the adjoining room. Officer Hernandez made a comment to Officer Riggs about him always complaining, and Officer Riggs stated, "What are you talking about? You sit next to DeOreo and her mouth is always open bitching." Appellee filed an internal office correspondence report in response to Officer Riggs's comment with Sergeant Peoples, but the report failed to go through proper channels. Appellee alleges that the incident and the manner in which the police department investigated the incident showed a retaliatory intent on the part of Appellant. We disagree.

Testimony at trial showed that Appellee was not in the room when the offending conversation occurred. Appellee offered no evidence to show that Officer Riggs intended for her to hear the comment, knew she would hear it, or that his motivation was to retaliate against her for filing a report against Harkrider. The fact that Appellee overheard a conversation about her, and that the conversation was derogatory in nature does not amount to retaliation under the Act. *Zimlich,* 29 S.W.3d at 69.

As to the allegation that the manner in which the complaint was handled amounted to retaliation, evidence at trial showed that the reported conduct did not violate the city's sexual harassment policy. Further, even though no violation occurred, Appellee's supervisor forced Riggs to apologize for the comment. This discipline effectively prevented a recurrence of the complained of behavior. We hold that the Riggs incident provided no evidence of a retaliatory intent on the part of Appellant.

The third alleged instance of retaliation occurred on March 28, 2000. On that night, a tornado ravaged downtown Fort Worth. Due to the emergency, Appellant called Appellee to work on her day off. During the night, officers from Appellee's unit were relieved one by one; however, Appellee was not relieved from her assigned duty until well after the rest of her unit had been allowed to go home. While Appellee waited to be relieved, she overheard a conversation on the radio in which an unidentified sergeant asked the dispatch officer if everyone had been relieved except for Appellee. When the dispatch officer confirmed this to the sergeant, the sergeant stated: "Good. I'm going home." Appellee eventually learned that Captain Baldwin had told the dispatcher to make sure that Appellee was the last one relieved that night. Appellee testified that

Captain Baldwin had told her on at least two occasions that "You've got the stigma attached to you because of Tim Harkrider."

During trial, Captain Baldwin testified that he knew of Appellee's report against Harkrider. He further testified that he discussed the Harkrider report with Appellee and told her that she had a stigma attached to her regarding the Harkrider incident. He told her that "any type of incident with this—you know, whether there's discipline in the past, that if you—you can work beyond that, then there's not a problem." Captain Baldwin stated that he intended for this speech to be positive and that he had given this speech to a number of officers before. The evidence shows, however, that Captain Baldwin equated Appellee's action of filing a report with another officer being disciplined for violating the rules. Captain Baldwin not only knew of the Harkrider report, he also expressed a negative attitude toward Appellee for filing the report, and he took an adverse personnel action against her as a result by requiring her to work later than the rest of her unit. This is some evidence of causation under the Act. *Cazarez,* 937 S.W.2d at 450; *McDill,* 914 S.W.2d at 723.

The fourth incident of alleged retaliation occurred in April of 2000 and involved Appellee's request for compensatory time instead of overtime pay during a Texas Motor Speedway duty assignment. Earning compensatory time allowed a police officer to accrue time off by working overtime. Apparently, Appellee and a number of other officers had asked to receive compensatory time for working the event. When asked about whether compensatory time could be accrued instead of overtime pay, Lieutenant Schnake told the DWI unit that compensatory time was unavailable for the event. Appellee later learned that some of her fellow officers had re-

ceived compensatory time instead of overtime pay for working the same event. When she questioned her sergeant over the issue, he stated, "I guess it depends on who you are around here." She further pursued the issue with Captain Baldwin.

Captain Baldwin was in charge of deciding whether compensatory time was awarded or not. Captain Baldwin stated that he had no knowledge of the fact that Appellee had wanted compensatory time instead of overtime pay for the race. Appellee's testimony confirms this statement because Appellee only verbally requested compensatory time before the race from Lieutenant Schnake. However, the evidence shows that when other officers approached Captain Baldwin after the race and requested compensatory time instead of overtime pay, he accommodated them. Captain Baldwin refused Appellee's similar request for compensatory time. Again, this is some evidence of causation under the Act. *Cazarez*, 937 S.W.2d at 450.

The fifth instance of alleged retaliation involved another confrontation with a fellow police officer. This incident occurred during roll call on May 4, 2000. Appellee was attempting to work out a problem she had with JPS nurses, and Officer Walton interrupted Appellee and said, "I don't have any problem." Appellee replied to Officer Walton, "Well, that's good, but the rest of us have had problems, and we need to discuss it." After roll call, Officer Walton approached Appellee in the parking lot of the police station. He yelled at her, calling her a "f—ing bitch," and, according to Appellee, was out of control.

Appellee filed another sexual harassment report based on this instance. Appellee offered no evidence at trial to show that Officer Walton's outburst was motivated by the Harkrider report. There was no evidence to show that Officer Walton knew of the report or that he harbored ill

feelings regarding the report. The evidence offered at trial through Appellee's testimony showed that Officer Walton's motivations were based solely on the original altercation that occurred during roll call. However, Appellee contends, and we agree, that the manner in which the department handled Appellee's complaint provides evidence of causation under the Act.

Appellee testified at trial that her superiors failed to properly investigate the sexual harassment report she filed regarding the Walton incident. The evidence showed that her supervisors took no action on Appellee's report for three weeks. After three weeks had passed, Appellee sent a copy of the report to Lieutenant Jones, who was the female coordinator. According to Appellee, Lieutenant Jones had no knowledge of the report. Departmental policy required that Lieutenant Jones receive a copy of any sexual harassment report filed by an officer. While waiting to talk to Appellee, Lieutenant Jones contacted internal affairs, which also had no knowledge of a report being filed over the incident. Appellee filed a new report regarding the incident directly with internal affairs. Once Appellee filed the new report, Appellee's superiors reassigned Officer Walton to the day shift until they completed the investigation. After the completion of the investigation, Officer Walton received a written reprimand and was placed back into the DWI unit. Appellee claims that this action was contrary to assurances she had received from her supervisors that Officer Walton would not be returned to the DWI unit.

Captain Baldwin testified at trial that the complaint did not amount to sexual harassment. Instead, Captain Baldwin stated that the complaint only amounted to inappropriate conduct and use of language. However, even if the final outcome of the

investigation showed that the report did not amount to sexual harassment, Chief Mendoza testified that this report, unlike the Riggs incident, could have possibly violated the city's sexual harassment policy, and Appellee's supervisors should have timely and thoroughly investigated it. In the Riggs report, the evidence at trial showed that the word "bitching" could be used interchangeably in referring to a male or female officer who complains a lot. In contrast, according to Chief Mendoza, the comment in the Walton report referred to Appellee being female and was derogatory of that fact. This meant that the city's sexual harassment policy might have been violated by this incident and an investigation should have been ordered immediately.

The fact that the investigation only occurred after Appellee went outside of her unit, coupled with the fact that Captain Baldwin knew of the Harkrider report and regarded it in a derogatory way, provides some evidence that this adverse employment action was caused by Appellee's report of Harkrider. *Zimlich*, 29 S.W.3d at 69.

Appellee's sixth example of retaliation involved her request to transfer during the Walton incident. Appellee received a phone call from Deputy Chief Curtis after she made her request to transfer. Deputy Chief Curtis allegedly asked her if she would stay in the DWI unit if Walton was transferred and Deputy Chief Curtis could assure her that she would not be retaliated against for the Walton incident. Appellee testified that, in reliance on these assurances, she withdrew her transfer request voluntarily in hopes that the harassment would cease when Officer Walton was transferred.

Appellee failed to show any evidence that Deputy Chief Curtis was aware of the Harkrider report. Deputy Chief Curtis testified that he was unaware of the Harkrider report, and that he never promised Appellee that Officer Walton would be permanently transferred from the DWI Unit. Further, there is no evidence that Appellee's superiors were attempting to trick Appellee into staying in the DWI unit. The evidence shows that Appellee's transfer request was approved prior to her withdrawing it. Appellee testified that none of her superiors told her that a new transfer request would not be granted. Appellee merely chose not to request a new transfer. As such, no proof exists to show that Appellant induced Appellee's withdrawal of her transfer request because of the Harkrider report.

In Appellee's final claim of retaliation, she points to Appellant's denial of her application to transfer from the DWI unit in a city wide sign-up. The announcement, addressed to all Field Operations Bureau (FOB) commanders, stated that the sign-up applied to FOB personnel only, and stated that if current NPO, bike officers, etcetera wanted to participate in the sign-up, they had to resign their current assignments and provide Deputy Chief Kneblick with an email or an interoffice correspondence prior to June 30, 2000.

Appellee testified that she knew that she was not in the Field Operations Bureau, but believed that she qualified for the sign-up because she had sent an email to the officer in charge. But in that email, Appellee had failed to resign from her current job before applying for the sign-up, which was required. Appellee maintains, however, that Appellant discriminated against her due to the Harkrider report over this action. As proof, Appellee claims that Captain Baldwin called her at home and stated, "You didn't hear this from me, but if you were anyone else, it would've been handled—your request would've been handled differently." When she then

asked him why her request would be handled differently than anyone else's, he allegedly told her, "you've got the stigma attached to you because of Tim Harkrider."

Deputy Chief Kneblick was in charge of the sign-up. She testified at trial that she would not have allowed any officer in a specialized unit, such as the DWI unit, to participate in the city-wide sign-up because it could have depleted the specialized unit. Apparently, the interview process for Appellee's job in the DWI unit would last over a month. Thus, if Deputy Chief Kneblick had allowed the officers in such specialized units to transfer out of these units en mass, the units would have had insufficient strength for a long period of time. This meant that Appellant's denial of Appellee's request to participate in the city-wide sign-up was based on a legitimate nonretaliatory reason. Without further evidence of Deputy Chief Kneblick's intent, the evidence offered amounted to nothing more than a mere scintilla of evidence and was legally insufficient to establish causation. *See Cazarez,* 937 S.W.2d at 450.

However, there is some evidence that Captain Baldwin might have discriminated against Appellee during the incident. The evidence shows that Appellee did not receive an explanation for the denial of her request to participate in the sign-up from Deputy Chief Kneblick. Instead, the evidence shows that Appellee's only explanation for the denial was from Captain Baldwin. Appellee could have reasonably assumed that Captain Baldwin, as her superior in the DWI unit, had some say in her request to participate in the sign-up. In fact, in order for Appellee to resign her position in the DWI unit, Captain Baldwin would have had to approve it. Appellee could further have reasonably assumed that Captain Baldwin prevented her transfer due to the Harkrider report. Captain Baldwin's statement could go to show that he was harassing Appellee because of the Harkrider report. We hold that there is some evidence to show that Captain Baldwin might have used the FOB sign-up to retaliate against Appellee for making the Harkrider report. *See Cazarez,* 937 S.W.2d at 450 (holding that circumstantial evidence that the stated reason for an adverse employment action was false can be evidence of causation in a whistleblower cause of action).

 Having found that legally sufficient evidence existed to support the finding of causation, we must now determine if the evidence was factually sufficient as well. An assertion that the evidence is "factually insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

The evidence shows that Captain Baldwin knew of the Harkrider report and that he reflected upon Appellee negatively for filing the report. While Captain Baldwin attempted to place the conversation in which he had stated that Appellee had a stigma attached to her due to the Harkrider incident in a good light, the evidence shows that he reflected negatively on the incident. Captain Baldwin stated that the Harkrider incident was something that Appellee could eventually work her way out of. He claimed that he had this same conversation with police officers who had been disciplined for violating the rules, and

equated Appellee's situation with those officers.

The evidence further shows that Captain Baldwin forced Appellee to work longer than the other members of the unit on the night of the tornado. Captain Baldwin also denied Appellee's request for compensatory time while granting it to similarly situated officers. Further, Captain Baldwin was responsible for not allowing the Walton report to go through proper channels, and he told Appellee that her request to participate in the sign-up was denied due to the Harkrider report.

Appellant responds by attempting to show legitimate reasons for the adverse actions taken by Captain Baldwin. Appellant first claims that the evidence shows that Captain Baldwin would not have chosen to retaliate against Appellee during one of the city's most devastating natural disasters the city has had. We note, however, that Appellant failed to come forward with an alternative explanation for the comment that Appellee heard over the radio, or Captain Baldwin's motivation for requiring Appellee to stay late on that night. As such, Appellant has not shown any evidence of a legitimate nondiscriminatory reason for Captain Baldwin to require Appellee to remain late on the night of the tornado.

Appellant also claims that the evidence was insufficient to show that the Harkrider report caused Captain Baldwin to treat Appellee differently by requiring her to take overtime pay instead of the requested compensatory time for her work at the race track. The evidence shows that Appellee verbally requested compensatory time instead of overtime pay for the race. Appellant claims that Appellee did not initially communicate this request directly to Captain Baldwin who was responsible for this decision. Appellee claims that she told Captain Baldwin that she wanted compensatory time after she received her check and found out that other officers had received compensatory time for working races.

Captain Baldwin testified that there was a misunderstanding as to whether or not compensatory time was going to be allowed for the races because the events were specially funded. Captain Baldwin stated that he eventually allowed compensatory time for these races and that if an officer would tell him that they wanted compensatory time instead of overtime pay for these events in a "timely manner," he would authorize the change in the officer's pay check. Appellant has failed to show how long a "timely manner" was and how Appellee's request for compensatory time fell outside of those parameters. The only evidence at trial shows that Appellee's request was treated differently than those of other officers in similar circumstances.

Regarding the Walton incident, the evidence shows that the manner in which Appellant handled the Walton report differed from what the city's sexual harassment policy required. Captain Baldwin testified that he reacted immediately to the report and ordered an investigation when he read it. However, Appellee introduced evidence to show that neither the office of internal affairs nor the female coordinator knew of the report until Appellee followed up on it three weeks after filing it. Appellee further testified that this violated the department's policy regarding the handling of sexual harassment reports.

Captain Baldwin testified that he did not feel that the comment violated Appellant's sexual harassment policy, but Chief Mendoza testified that if the comment could be proved, it might very well violate the City's sexual harassment policy. The weight given to contradictory testimonial evidence is within the sole province of the

fact finder because it turns on an evaluation of credibility and demeanor. *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim.App.1997). Thus, we must defer to the fact finder's weight-of-the-evidence determinations. *See id.* at 409. The evidence supports an inference that Appellant through Captain Baldwin attempted to delay a legitimate sexual harassment report because of the Harkrider report. *Cazarez*, 937 S.W.2d at 450.

Finally, the fact that Appellant showed a legitimate nondiscriminatory reason for not granting Appellee's request to participate in the city-wide sign-up does not prove that she was not subjected to discrimination for the Harkrider report in that situation. The evidence shows that Captain Baldwin gave her a false reason for the denial. Captain Baldwin told Appellee that her request would have been handled differently if not for the Harkrider report, while the evidence shows that the real reason was because Appellee had failed to resign her current job with the DWI unit. The evidence further shows that Captain Baldwin refused to allow Appellee to see the memo explaining why she was not allowed to participate in the sign-up. The memo was dated June 27th, and the FOB sign-up was not closed until June 30th. This meant that had Captain Baldwin informed Appellee of the true reason or allowed Appellee to see the memo explaining the true reason when the memo was issued on the 27th, Appellee could have corrected her mistake and participated in the sign-up. The fact finder could have concluded that Captain Baldwin was attempting to prevent Appellee from transferring out of his unit by refusing to tell her the true reason for the denial in a timely manner and, instead, telling her that the Harkrider report had caused the denial.

We hold that the evidence is factually sufficient to show that Appellee would not have suffered adverse employment actions but for the fact that she filed a protected report under the Act. Having held that Appellee suffered adverse employment actions because of the Harkrider report, we must now determine whether the evidence is legally and factually sufficient to show that the adverse employment actions caused Appellee's constructive discharge.

 A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Wal–Mart Stores, Inc. v. Bertrand*, 37 S.W.3d 1, 8 (Tex.App.-Tyler 2000, pet. denied). To find a constructive discharge, the fact finder must determine whether or not a reasonable person in the employee's position would have felt compelled to resign. *Green v. Industrial Specialty Contractors, Inc.*, 1 S.W.3d 126, 134 (Tex.App.-Houston [1st Dist.] 1999, no pet.). It is necessary to examine the conditions imposed, not the employer's state of mind. *Hammond v. Katy ISD*, 821 S.W.2d 174, 177 (Tex.App.-Houston [14 Dist.] 1991, no writ). Therefore, an employee does not need to prove that an employer subjectively intended to force the employee to resign. *Id.*

 The evidence includes a number of factors that go to show a constructive discharge, including: Captain Baldwin's comments that Appellee had a stigma attached to her because of the Harkrider report; Captain Baldwin's attitude that the Harkrider report was a disciplinary violation; Appellant denying Appellee's request for compensatory time instead of overtime; Appellant's complete failure to forward Appellee's complaint about the Walton incident through the proper channels; Captain Baldwin's belief that the incident did not constitute sexual harassment; and Captain Baldwin's false comments to Ap-

pellee about the reason she was not allowed to participate in the FOB sign-up. Further, Officer Thompson and Officer Ramero both testified that if they had suffered the retaliation that Appellee had, they would have resigned. Considering only the evidence and inferences that tend to support the finding and disregarding all evidence and inferences to the contrary, we hold that the evidence was legally sufficient to support a finding of constructive discharge. *Bradford,* 48 S.W.3d at 754.

Appellant claims that, even if some evidence shows that Appellee was constructively discharged, the evidence was factually insufficient to support such a finding. Appellant claims that the four instances of retaliation were not severe enough to prove that a reasonable person in Appellee's situation would have resigned. We disagree.

Appellant claims that the fact that Appellee was required to work longer on one night and was required to take overtime pay instead of compensatory time did not make her work environment intolerable. Appellant further states that the evidence of retaliation regarding the Walton incident did not show an intolerable working environment. Instead, Appellant claims that the facts show that Appellant conducted a thorough investigation over the Walton incident once it was filed for the second time. Further, Officer Walton received a written reprimand over the incident. The evidence further shows that the written reprimand was effective to prevent a repeat offense in this case. Appellant contends that the fact that the investigation should have begun over three weeks earlier did not make Appellee's working conditions intolerable. Finally, Appellant states that the denial of Appellee's request to participate in the city-wide sign-up could not provide enough evidence to support a finding of constructive discharge.

Appellee offered her own testimony along with that of Officer Ramero and Officer Thompson to show that a reasonable person who suffered the retaliation that Appellee suffered would have resigned. Officer Ramero testified that, based on the health effects Appellee was suffering from, she would have resigned under similar circumstances. Officer Thompson testified that Appellee's work environment was intolerable. He testified that being a police officer was all he had ever wanted to be, but if he had been treated the same way Appellee was treated, he would have quit.

The evidence further shows that Appellee could be attacked verbally and nearly physically by one of her fellow police officers without any immediate protection from her supervisors. Appellee was forced to seek a transfer from her unit before a proper investigation over the Walton incident began. This is the same incident that the chief of police testified could amount to sexual harassment if proven.

Further, the evidence shows that Captain Baldwin expressed displeasure over the Harkrider report. He then began a systematic form of harassment. He forced Appellee to work later than the rest of her unit. The evidence shows that Captain Baldwin then refused her request for compensatory time while granting other officers' similar requests.

The evidence further supports the conclusion that Captain Baldwin attempted to cover up a potentially dangerous situation between Officer Walton and Appellee. Captain Baldwin testified that he felt that the Walton incident was similar to the Riggs incident. He testified that both incidents amounted to merely inappropriate language. The evidence shows that no one outside of the DWI unit knew of the Walton report three weeks after the incident, which was against Appellant's sexual

harassment policy. It is reasonable to assume that Captain Baldwin was not going to report the Walton incident like he decided not to report the Riggs incident.

Finally, when Appellee attempted to transfer away from her superiors and Captain Baldwin, the evidence shows that he attempted to prevent her from transferring. The evidence shows that Captain Baldwin refused to allow Appellee to review the memorandum explaining her denial to participate in the sign-up. Had Captain Baldwin allowed Appellee to do so, she might have been able to resign her current position and participate in the sign-up. The manner in which Captain Baldwin prevented Appellee's transfer left the reasonable impression with Appellee that Captain Baldwin would not allow her to transfer to a different unit.

 Appellant acknowledges that one factor that can go to prove a constructive discharge is when the employer badgers, harasses, or humiliates an employee in order to encourage the employee's resignation. *Barrow v. New Orleans Steamship Ass'n,* 10 F.3d 292, 297 (5th Cir.1994) (holding that there are seven factors a fact finder looks at to determine whether a constructive discharge occurred, one of which is badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation). The evidence shows that Captain Baldwin knew of the Harkrider report; he equated Appellee with another officer who was disciplined for breaking the rules, which showed that he looked on the Harkrider report with some amount of disdain; he delayed a legitimate harassment report filed by Appellee, which caused Appellee to remain in close proximity to the offending officer for three weeks after the incident; he actively prevented Appellee from transferring out of his unit, which caused Appellee to reasonably think that she would not

be allowed to transfer at all; and then he harassed Appellee claiming that the report was responsible for her not obtaining a transfer. This evidence was factually sufficient to show that Appellant intended to badger, harass, and/or humiliate Appellee in order to encourage her to resign. *Id.* We overrule Appellant's third through sixth and ninth through eleventh issues on appeal.

## V. BACK PAY

 Appellant claims in its seventh issue that the evidence is legally and factually insufficient to support the trial court's damages award. Specifically, Appellant claims that the evidence was legally and factually insufficient to support the finding that Appellant's actions caused Appellee to lose $55,000 in back pay. Appellant failed to further brief this contention. Appellant gives no record references, arguments, or case law to support its contention. Appellant has, therefore, waived its seventh issue on appeal. *See* Tex.R.App. P. 38.1(h); *Tarrant County v. Van Sickle,* 98 S.W.3d 358, 369 (Tex.App.-Fort Worth 2003, pet. denied).

## VI. COMPENSATORY DAMAGES

 Appellant claims in its eighth issue that the evidence was legally and factually insufficient to support the compensatory damages award. Specifically, Appellant claims that the evidence is insufficient to support the court's award and judgment of $25,000 in compensatory damages. Appellant claims that the trial court erred because Appellee is only entitled to recover a sum that will reasonably and fairly compensate her for her actual damages. While Appellant concedes that Appellee may be entitled to mental anguish damages if she proved them, Appellant claims that there was no evidence or, in the alternative, insuffi-

cient evidence to support an award of mental anguish damages in this case.

 A mental anguish damages award cannot be supported absent direct evidence of the nature, duration, or severity of the anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995). Using these standards, appellate courts must closely scrutinize mental anguish damages awards. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex.1997).

The evidence shows that Appellee suffered physically as a result of Appellant's retaliation based on the Harkrider report. Appellee testified that she cried a lot and experienced severe anger over the incidents. She stated that she felt like she had betrayed her father's memory by leaving the police force. She suffered feelings of worry and dread. Appellee's stress eventually led to her hospitalization for treatment of high blood pressure during the time when Appellant was retaliating against her. Appellee and Officer Thompson both testified that her blood pressure rose to stroke level and that she ordinarily had low blood pressure. This evidence goes beyond showing mere worry, anxiety, vexation, embarrassment, or anger. *Saenz*, 925 S.W.2d at 614; *Woodruff*, 901 S.W.2d at 444. These facts provide legally and factually sufficient evidence to show that Appellee's health was impacted by the retaliation to such a degree that she is entitled to mental anguish damages. We, therefore, overrule Appellant's eighth issue on appeal.

## VII. CONCLUSION

Having overruled all of Appellant's points on appeal, we affirm the trial court's judgment.