

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-05-00373-CV

WAFFLE HOUSE, INC.                                        APPELLANT

V.

CATHIE WILLIAMS                                            APPELLEE

----------

## FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1] ON REMAND

----------

This case is on remand from the Supreme Court of Texas, which reversed this court's previous affirmance of the trial court's judgment in favor of Appellee Cathie Williams.[2] Williams had sued Appellant Waffle House, Inc. on a claim for negligent retention and supervision based on the behavior of a coworker. She

---

[1]*See* Tex. R. App. P. 47.4.

[2]*Waffle House, Inc. v. Williams*, 314 S.W.3d 1 (Tex. App.—Fort Worth 2007) (*Waffle House I*), *rev'd*, 313 S.W.3d 796 (Tex. 2010) (*Waffle House II*).

also asserted a statutory sexual harassment claim under the Texas Commission on Human Rights Act (TCHRA)[3] (chapter 21 of the labor code) based on the same behavior. We previously affirmed the trial court's judgment on Williams's negligence claim and therefore did not reach Waffle House's arguments regarding Williams's statutory sexual harassment claim. After reversing on the ground that the TCHRA is the exclusive remedy for sexual harassment under Texas law, the Supreme Court directed this court to consider Waffle House's arguments on Williams's statutory claim.[4]

In two issues, Waffle House argues that Williams waived her right to recover on her TCHRA claims by failing to file a notice of appeal to challenge the trial court's denial or omission of that relief in the final judgment and, alternatively, that the evidence is legally and factually insufficient to support the jury's findings on sexual harassment, constructive discharge, and punitive damages. Because we hold that Williams did not waive her right to recover under the TCHRA, that the evidence was sufficient to support the jury's findings, and that the damage award has to be capped under the labor code, we affirm the trial court's judgment in part as modified. Because the trial court made no findings on attorney's fees or expert costs and because pre- and post-judgment interest must be recalculated, we reverse and remand in part.

---

[3]Tex. Lab. Code Ann. §§ 21.001–.556 (West 2006).

[4]*Waffle House II*, 313 S.W.3d at 813.

2

## I. Background Facts and Procedural History

In July 2001, Waffle House hired Williams as a waitress. During Williams's employment with Waffle House, she had a number of different managers. At the time of her hiring, Ossie Ajene was the store manager, and T.J. Marshall was the district manager. In December 2001, Kevin Love replaced Ajene as the store manager. Allen Conley replaced Marshall as the district manager in January 2002. Kevin Ross was the division manager (the manager over the district managers) at that time. Managers did not usually work the third shift, the shift that Williams worked.

Within Williams's first week of work, she became the recipient of unwelcome sexual behavior and comments from fellow employee Eddie Davis, a cook. Williams reported Davis to Ajene, Marshall, Love, and Conley. She also called a Waffle House corporate telephone line to report the problem. Davis was moved to a different shift, but his unwelcome behavior continued.

In February 2002, Williams quit her job at Waffle House. After receiving right to sue notices from the EEOC and the Texas Commission on Human Rights, Williams filed suit against both Davis and Waffle House. She asserted a claim for assault and battery against Davis. Against Waffle House, she alleged negligent supervision and retention, as well as ratification of Davis's assault and battery. She also alleged sexual harassment and retaliation under the TCHRA.[5]

---

[5]Tex. Lab. Code Ann. §§ 21.001–.556.

Davis, who could not be found at the time of trial, was nonsuited by Williams before trial.

In a 10-2 verdict, the jury found that Davis had sexually harassed Williams and that Waffle House's negligence in supervising Davis proximately caused Williams's damages. The jury also found that Waffle House constructively discharged Williams by an official action. The jury did not find that Waffle House ratified Davis's assault. The jury also found that Waffle House did not retaliate against Williams for making her sexual harassment complaint. The jury found $400,000 in past compensatory damages, $25,000 in future compensatory damages, and $3,460,000 in punitive damages. The trial court rendered judgment awarding the past and future compensatory damages, $53,201.09 in prejudgment interest, and $4,728.60 for court costs. The court lowered the punitive damages award to $425,000 due to the general cap on punitive damages. Waffle House filed a motion for new trial and, alternatively, a suggestion of remittur of damages, and a motion for judgment notwithstanding the verdict. The trial court denied the motions, and Waffle House appealed.

On Williams's negligent supervision or retention claim, Waffle House challenged the sufficiency of the evidence on breach of duty and causation.[6] This court held that the evidence was sufficient on both elements and that "[t]he evidence presented at trial showed that Waffle House did not conduct a sufficient

[6]*Waffle House I*, 314 S.W.3d at 9.

4

investigation given the gravity of Williams's complaints, did not follow its own procedures for investigating such complaints, [and] did not take reasonable precautions to prevent interaction between Williams and Davis."[7]  Because this court affirmed on Williams's common law claim, it did not reach Waffle House's arguments with respect to her statutory harassment claim.[8]

On review, the Supreme Court of Texas reversed this court and held that Williams's common law claim failed because her exclusive remedy against Waffle House was her statutory harassment claim under chapter 21.[9]  That court remanded the case back to this court to consider the statutory sexual harassment issues raised by Waffle House and not previously addressed by this court.[10]

## II.  Waiver

Waffle House argues in its first issue that because the trial court's judgment denied or omitted recovery on Williams's TCHRA claim, she abandoned the claim by failing to file a notice of appeal challenging the judgment on the ground that it omitted her requested alternative relief.  We disagree.

---

[7]*Id.* at 11.

[8]*Id.* at 15.

[9]*Waffle House II*, 313 S.W.3d at 813.

[10]*Id.*

Williams submitted to the trial court two proposed judgments. Each judgment awarded recovery on the negligence findings, but one capped the punitive damages and the other did not. Both of the proposed judgments included alternative relief recognizing the jury's favorable findings on Williams's TCHRA claim and the award of attorney's fees and expert fees. Williams acknowledged that the expert costs and attorney's fees were only recoverable under the TCHRA claim and not under the negligence theory,[11] and she explained to the trial court that she had requested the alternative relief in the event that the negligence claim was reversed on appeal.

Waffle House objected to Williams's proposed judgments on the ground that the judgment "should reflect one award, either the sexual harassment claim or the negligent supervision claim," and that Williams "should be forced to elect the greater of the two," or, if she would not, then the trial court should award the greater of the two recoveries. As requested by Waffle House, the trial court signed a judgment that did not award the requested alternative relief. The judgment stated that the jury had made findings that the court "has received, fully

---

[11]*City of Watauga v. Taylor*, 752 S.W.2d 199, 205 (Tex. App.—Fort Worth 1988, no writ) (stating that attorney's fees are not recoverable under a negligence claim); *Shenandoah Assocs. v. J & K Props., Inc.*, 741 S.W.2d 470, 486 (Tex. App.—Dallas 1987, writ denied) (stating general rule that expenses incurred in prosecuting a suit are not recoverable as costs unless recovery is provided for by statute); *Whitley v. King*, 581 S.W.2d 541, 544 (Tex. Civ. App.—Fort Worth 1979, no writ) (stating that "costs of experts are 'merely incidental expenses in preparation for trial and not recoverable'"); *cf.* Tex. Lab. Code Ann. § 21.259(c) (providing that the trial court may in its discretion award expert fees in an action under the TCHRA).

6

adopted[,] and entered into the [c]ourt's record."  The judgment then stated that "each and every one of the jury's responses" to the charge was incorporated by reference.  The judgment ordered that Williams not recover attorney's fees and expert costs; as Williams pointed out to the court, these costs were not recoverable under her negligence cause of action.[12]  Williams did not file a notice of appeal, but in her appellee's brief, she did argue that should her negligence claims be reversed, she was entitled to recover on her sexual harassment claim.

Williams was not required to do more than she did to preserve her right to alternative relief.  In *Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*, Boyce sued Southwestern Bell on alternative theories of negligence and violations of the Deceptive Trade and Practices—Consumer Protection Act (DTPA).[13]  Boyce obtained favorable jury findings on both theories of recovery.[14] The trial court rendered a judgment granting the more favorable relief under the DTPA.  The judgment incorporated the jury's verdict "for all purposes."[15] Southwestern Bell appealed, and, in a crosspoint, Boyce asked the court of appeals to render judgment on its negligence theory if it reversed on its DTPA

---

[12]*City of Watauga*, 752 S.W.2d at 205; *Shenandoah Assocs.*, 741 S.W.2d at 486.

[13]747 S.W.2d 785, 787 (Tex. 1988).

[14]*Id.* at 786.

[15]*Id.*

7

claim.[16]  The Supreme Court of Texas considered whether Boyce was required to have raised a complaint in the trial court before raising a crosspoint on appeal asking for an award on its negligence claim.[17]  The Supreme Court held that when a jury returns favorable findings on alternative theories, the prevailing party "may seek recovery under an alternative theory if the judgment is reversed on appeal."[18]  The court noted that the general rule that a party must bring error to the trial court's attention before complaining by crosspoint on appeal "does not apply in this case because Boyce received a favorable judgment and had no reason to complain in the trial court."[19]  The court stated that "Boyce was not required . . . to raise the issue of alternative grounds for recovery until the court of appeals rendered its judgment reversing the DTPA judgment" and that "Boyce had no duty to complain in the trial court when it recovered all relief available under its DTPA claim."[20]  Finally, the court said that "[b]y incorporating the jury's findings in the court's judgment, Boyce did everything it could to preserve the right of recovery under the alternative theory."[21]

---

[16]*Id.* at 786–87.

[17]*Id.* at 787.

[18]*Id.*

[19]*Id.* at 787.

[20]*Id.*

[21]*Id.*

In 2006, the Supreme Court held that when a party has been awarded the more favorable recovery under two theories, the party is "not required to raise the alternative theory as a cross point on appeal."[22]  Two years later, the Supreme Court discussed *Boyce*, characterizing it as holding that "a litigant who has obtained a favorable judgment and has no reason to complain in the trial court is not required to raise an issue regarding an alternate ground of recovery *until an appellate court reverses the judgment*."[23]  Thus, the plaintiff in that case "was not required to raise his alternate theory of recovery until the judgment in his favor about which he had no complaint was reversed."[24]

Waffle House argues that *Boyce* does not help Williams because the rule from that case applies if an appellee receives a favorable judgment and is satisfied with it, and "to be satisfied" with the judgment "is not to be satisfied with what one believes could have been awarded in the judgment."  That is, Williams is not entitled to have a court "go back and fashion a new judgment that she believes she could have been awarded (but was explicitly denied instead)."  Waffle House also argues that whereas in *Boyce*, the trial court had incorporated the jury findings "for all purposes," here the trial court "merely stated that it 'fully adopted'" the jury's findings "and incorporated [them] by reference."

---

[22] *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 566 n.9 (Tex. 2006).

[23] *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 603 (Tex. 2008) (discussing *Boyce*) (emphasis added).

[24] *Id.*

9

Waffle House's attempts to distinguish the case law are unpersuasive. The trial court here clearly adopted and incorporated all of the jury's findings, and it was not necessary for the court to use the words "for all purposes." The trial court then awarded Williams the highest relief that she could have recovered under the verdict. Williams had no duty to complain in the trial court or on appeal here when she recovered all the relief that was available to her on her negligence claim and when she could not recover under both her negligence and statutory claims.[25] She had nothing to complain about at that point and was not required to raise the alternative theory on appeal until a court had reversed that judgment about which she had no complaint.[26] On remand to this court, Williams has argued that she should be awarded recovery on her alternative theory, and she has not waived the issue by failing to have filed a notice of appeal or a cross-appeal when the case was previously before this court.[27]

Waffle House also argues that this court has held that an appellee must file a notice of appeal and crosspoints in order to have the right to seek a modified

---

[25]See id. at 603.

[26]See Hoover Slovacek LLP, 206 S.W.3d at 566 n.9.

[27]See Commonwealth Lloyds Ins. Co. v. Downs, 853 S.W.2d 104, 109 (Tex. App.—Fort Worth 1993, writ denied) (allowing the appellee to challenge the trial court's failure to award alternative relief in its judgment by requesting in his prayer that the judgment be affirmed or, alternatively, modified, even though he had not brought a crosspoint on that issue).

judgment on alternative claims, citing *Commonwealth Lloyds Ins. Co. v. Downs*.[28] Waffle House is incorrect; nowhere in *Downs* did this court state that without filing a notice of appeal or asserting a crosspoint, an appellee may not request a judgment on alternative claims.[29] This court stated that although Downs had filed cross-points, they were "not phrased so as to request that this court affirm the judgment on the alternative causes of action if the judgment cannot be affirmed on the causes of action" on which the judgment had been based.[30] We nevertheless considered Downs's challenge to the trial court's action in denying judgment on the alternative causes of action. And we did not state that an appellee must filed a notice of appeal to be entitled to alternative relief upon reversal of a favorable judgment; the appellee in that case had filed a notice of appeal for the crosspoints he had raised, so the issue did not arise. We overrule Waffle House's first issue.

### III. Sufficiency of the Evidence

In its second issue, Waffle House argues that the evidence is legally and factually insufficient to support the jury's findings that Williams was sexually harassed, that she was constructively discharged, and that Waffle House acted with malice or reckless indifference to Williams's right to be free from sex

---

[28]*Id.*

[29]*Id.*

[30]*Id.*

11

discrimination. Waffle House also argues that the evidence did not permit the jury to conclude that Waffle House failed to take prompt remedial action.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[31] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[32]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the

---

[31]*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[32]*Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[33]

## A. *Jury's Findings on Sexual Harassment*

Under the TCHRA, an employer commits an unlawful employment practice if, (1) because of sex, (2) the employer, among other things, discharges or discriminates against an individual (3) in connection with compensation or the terms, conditions, or privileges of employment.[34] An employer also commits an unlawful employment practice if, (1) because of sex, (2) the employer "limits, segregates, or classifies an employee or applicant for employment in a manner that would [a] deprive or tend to deprive an individual of any employment opportunity or [b] adversely affect in any other manner the status of an

---

[33]*Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[34]Tex. Lab. Code Ann. § 21.051; *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 374–75 (Tex. App.—Fort Worth 2006, no pet.) (noting that because the Texas Legislature adopted labor code chapter 21 for the express purpose of carrying out the policies of Title VII of the federal Civil Rights Act of 1964 and its amendments, "when reviewing an issue in a proceeding brought under chapter 21, we may look . . . to cases interpreting the analogous federal provisions"); *see also Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004) (stating that federal case law may be cited as authority in cases relating to the TCHRA).

employee."[35]  Sexual harassment is a form of sex-based discrimination prohibited under the labor code.[36]

Courts have distinguished between two types of sexual harassment claims:  "quid pro quo" claims and "hostile work environment" claims.  A "quid pro quo" sexual harassment claim is one in which a supervisor made threats affecting the terms or conditions of a subordinate's employment by conditioning them on the employee's grant of sexual favors and, when the employee refused, the supervisor carried out his or her threat.[37]  A "hostile work environment" claim is one in which either no threats to the terms or conditions of employment are made or the threats are not carried out, but the employer's sexually demeaning behavior nevertheless altered terms or conditions of employment.[38] Distinguishing between these two types of claims serves a specific and limited

---

[35]Tex. Lab. Code Ann. § 21.051.

[36]*Cox v. Waste Mgmt. of Tex., Inc.*, 300 S.W.3d 424, 432 (Tex. App.—Fort Worth 2009, pet. denied).

[37]*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–53, 118 S. Ct. 2257, 2264 (1998).  To the extent that the opinion in *Wal-Mart Stores, Inc. v. Itz* from our sister court of appeals can be read to suggest that a quid pro quo claim is any sexual harassment claim in which a tangible employment action has been alleged, we disagree.  *See* 21 S.W.3d 456, 470 (Tex. App.—Austin 2000, pet. denied) (stating that the elements of a quid pro quo sexual harassment claim are that "(1) [a] supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship" and citing *Ellerth*).  A hostile work environment claim may also involve a tangible employment action.  *See Pa. State Police v. Suders*, 542 U.S. 129, 143, 124 S. Ct. 2342, 2352 (2004).

[38]*Ellerth*, 524 U.S. at 751–53, 118 S. Ct. at 2264.

purpose: to determine the threshold question of whether the conduct in question constituted discrimination in violation of Title VII.[39] In "quid pro quo harassment," because employment benefits are conditioned on sexual favors and the employee is retaliated against for denying those favors, the "discrimination with respect to terms or conditions of employment [is] explicit."[40]

In "hostile work environment harassment," when threats to retaliate against an employee for denying sexual liberties are either not made or are not carried out and the claim is based on "bothersome attentions or sexual remarks," the plaintiff must show that the harassment is sufficiently severe or pervasive to create a hostile work environment.[41] Thus, the use of the these terms is helpful to distinguish between claims in which alterations of the terms or conditions of employment were explicit and those in which the alterations were constructive, in which case the plaintiff must show severe or pervasive conduct.[42] But whether an employer is vicariously liable for an employee's discrimination does not

---

[39]*Id.*

[40]*Id.* at 752, 753–54, 118 S. Ct. at 2264, 2265 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment.").

[41]*Id.* at 751–52, 118 S. Ct. at 2264.

[42]*Id.*

15

depend on which kind of claim is asserted by the plaintiff.[43] As discussed below, an employer may be liable for a hostile work environment claim under agency principles and the avoidable consequences doctrine of tort law.[44] This is the form of sexual harassment alleged by Williams.

Hostile work environment sexual harassment is recognized as a violation of Title VII because "a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living" is an arbitrary barrier to sexual equality at the workplace.[45] A "discriminatorily abusive work environment" can "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," and "the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees" because of their gender offends the "broad rule of workplace equality" of Title VII of the federal Civil Rights Act of 1964, and, consequently, of the TCHRA.[46]

---

[43]*Id.* at 751–52, 754, 118 S. Ct. at 2264, 2265 (stating that "[t]he terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility" and that the factors discussed in the opinion "and not the categories *quid pro quo* and hostile work environment" control on the issue of vicarious liability).

[44]*See id.* at 760, 764, 118 S. Ct. at 2268, 2270.

[45]*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)).

[46]*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 370–71 (1993); *see also Herbert*, 189 S.W.3d at 374–75.

16

To some claims of hostile work environment sexual harassment, an employer may assert an affirmative defense (as discussed below), but for other claims, the employer is strictly liable.[47]  For purposes of determining whether the employer is strictly liable, hostile work environment sexual harassment claims can be further divided into two categories:  (1) claims alleging harassment culminating in a tangible employment action and (2) claims asserting no tangible employment action.[48]  A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[49]  The employer in such a case is strictly liable for an employee's harassment by a supervisor under the common law "aided in the agency relation rule" of agency law because "[a] tangible employment decision requires an official act of the enterprise, a company act" and "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted  absent the agency relation."[50]

But for a claim in which the employee does not allege a tangible employment action, borrowing from the avoidable consequences doctrine, the

---

[47] *Suders*, 542 U.S. at 143, 124 S. Ct. at 2352.

[48] *Id.*

[49] *Ellerth*, 524 U.S. at 760, 761, 118 S. Ct. at 2268.

[50] *Ellerth*, 524 U.S. at 759–62, 118 S. Ct. at 2268, 2269; *see also Suders*, 542 U.S. at 143, 124 S. Ct. at 2352.

United States Supreme Court has said that the employer may assert an affirmative defense to liability based on the employer's efforts at preventing and correcting harassment.[51] To establish this defense, the employer must show (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer" or to otherwise avoid harm.[52]

In some cases an employer has not fired an employee or taken some other tangible employment action, but the employer has nevertheless made the "working conditions so intolerable that a reasonable person would [feel] compelled to resign."[53] Such behavior by the employer is referred to as "constructive discharge."[54]

In *Suders*, the United States Supreme Court discussed one subset of constructive discharge claims: constructive discharge resulting from a hostile work environment attributable to a supervisor.[55] The Court distinguished

---

[51]*Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998).

[52]*Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293.

[53]*Suders*, 542 U.S. at 147, 124 S. Ct. at 2354.

[54]*Id.* at 140, 146, 124 S. Ct. at 2351, 2354 (stating that the constructive discharge at issue in that case as stemmed from and could be regarded as "an aggravated case[] of sexual harassment or hostile work environment").

[55]*Id.* at 143, 124 S. Ct. at 2352.

between constructive discharge claims involving a tangible employment action and those that do not, recognizing that the conduct leading to the employee's decision to resign may or may not have involved official action by the employer.[56] The Court noted that with respect to the damages-enhancing provision of Title VII, constructive discharge is "functionally the same as an actual termination," and for remedial purposes is likened to formal discharge.[57] But, the Court stated, unlike employers in cases of formal termination, an employer is not always strictly liable for this type of sexual harassment claim.[58] Under federal law at least, whether an employer may assert an affirmative defense to a claim of constructive discharge depends on whether a supervisor's official act precipitates the constructive discharge; "when an official act does not underlie the constructive discharge," the employer may assert the affirmative defense.[59]

---

[56]*Id.* at 141, 148, 124 S. Ct. at 2351, 2355; *see also Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008) (stating that "[i]n certain circumstances, a constructive discharge can be considered a tangible employment action that precludes an employer from asserting" the affirmative defense established under United States Supreme Court case law); *Cox*, 300 S.W.3d at 433 (noting that "[a] constructive discharge *may* qualify as a tangible employment action" (emphasis added)). *But see Waffle House II*, 313 S.W.3d at 805 (citing *Suders* and stating without qualification that "[a] constructive discharge qualifies as an adverse personnel action under the TCHRA").

[57]*Suders,* 542 U.S. at 148, 124 S. Ct. at 2355.

[58]*Id.*

[59]*Id.*

Waffle House argues that the evidence is not sufficient to support a finding of either constructive discharge or hostile work environment. We first consider the sufficiency of the evidence on Williams's hostile work environment claim.

**(1) Hostile Work Environment**

As noted above, to establish a claim for hostile work environment sexual harassment, the complained-of conduct must be severe *or* pervasive enough "'to alter the conditions of [the complainant's] employment and create an abusive working environment.'"[60] Thus, the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" will not constitute sexual harassment for which an employer may be held liable.[61] An employer may be found liable for the conduct of a supervisor based on that supervisor's failure "to act to abate sexual harassment by others after learning of it."[62]

To determine whether a hostile work environment exists, courts must look to all of the circumstances.[63] These circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[60]*Meritor Sav. Bank*, 477 U.S. at 67, 106 S. Ct. 2405; *Zeltwanger*, 144 S.W.3d at 445 n.5; *see also Ellerth*, 524 U.S. at 754, 118 S. Ct. at 2265.

[61]*Harris*, 510 U.S. at 21, 114 S. Ct. at 370.

[62] *Itz*, 21 S.W.3d at 472.

[63]*Id.*; *see also Harris*, 510 U.S. at 23, 114 S. Ct. at 371.

with an employee's work performance."[64]   The environment must be both subjectively and objectively offensive:  it must be an environment that the plaintiff perceived to be offensive and one that a reasonable person in the plaintiff's position would consider to be offensive.[65]

Not only did Williams testify that she found the behavior offensive, but she reported Davis's behavior to four managers whom she worked under during the time she worked with Davis at Waffle House, and she told both fellow waitress Bobbie Griffith and Love that she was considering quitting her job because of the lack of any response from Waffle House.   Griffith testified that Williams was frustrated and cried "a lot" because of Davis's behavior and the lack of response by Waffle House.  The evidence is clearly both legally and factually sufficient that Williams perceived the work environment to be offensive.

We therefore consider whether the evidence was sufficient to meet the objective part of this standard, that is, whether a reasonable person in Williams's position would have found the environment to be offensive.[66]   Davis made his first unwelcome sexual comment to Williams sometime within her first week on

---

[64]*Harris*, 510 U.S. at 23, 114 S. Ct. at 371; *Itz*, 21 S.W.3d at 472.

[65]*Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 42 (Tex. App.—Austin 1998, pet. denied); *see also Harris*, 510 U.S. at 21–22, 114 S. Ct. at 370.

[66]*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998) (noting that the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances'").

the job with him in July 2001.  As Williams walked up to Davis and Pat (a waiter and the only employee on the premises other than Davis and Williams), Davis looked her up and down, said "Uhmm," and told the other waiter that Williams "looked like [his] baby's mama."  He had also said that Williams "ha[s] a fine ass for a white woman."  Williams testified that Davis's comments made her feel "dirty" because "he's referring to [her] as someone he had sex with."  Williams stated that she had had no training on what to do in this type of situation.  But, she testified, she reported the incident to her manager, Ajene, the first time she saw him, which was within a couple of days of the occurrence.

On another occasion, while Williams was washing dishes, Pat took a spoon "and put it in [her] back and asked [her] if [she'd] ever been spooned or if [she] wanted to be."  He then "took out a whisk and kind of whisked it in [her] back and said, 'Have you ever been whisked'?"  At the time, Davis was also there.  Both men "were acting like it was funny," which Williams testified made her feel as though she "didn't have a choice," as though she were expected to go along with their joking.  Williams sprayed Pat with the hose at the sink and told him to stop, and she testified that he did so.  Pat stopped his behavior, but Davis did not.

Ajene testified that he first heard about the problem from Griffith, to whom Williams had complained about the matter.  But Williams testified that she

22

personally told Ajene, and the jury was free to believe her.[67]  In her testimony, Williams stated that when she told Ajene, he "laughed and said that doesn't sound like [Davis]."  When she insisted, Ajene responded, "Fine.  I'll talk to him."  But nothing changed, and Williams testified that Davis "kept on."

Williams told the jury that Davis would corner her and push her into things—"into the counters[,] and into the grill, into the dish table.  Every time I'd walk by, he'd back up and push me into things."  Davis, who was black, asked Williams "if [she] ever had the flavor of a black man or if [she] ever wanted to."  While he was saying this to her, Davis had "his hands down his pants," which Williams said he did often.

After Williams complained to Ajene about Davis, Ajene held a meeting with Williams, Davis, and Griffith about Davis's temper, at which Davis, who was much larger than Williams, "put his finger in [Williams's] face" and told her that she "was too tense and [she] need[ed] to quit being so sensitive."  Ajene talked to Davis about Williams's complaints, but Williams testified that this talk did not solve the problem, and instead Davis became even more hostile.  Whenever

---

[67]*See In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder's function "is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony"); *see also State Farm Fire & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 321 (Tex. App.—San Antonio 2002, pet. denied) ("It is fundamental that a jury may blend the evidence admitted before it and believe all, some[,] or none of a witness's testimony."), *abrogated on other grounds by Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 26–27 (Tex. 2008).

Williams came anywhere near him, "he'd be real huffy and push [her] around." If she came near him, "he made a point to push [her] out of his way and told [her] to get the F off his grill." Williams testified that she reported Davis's behavior to Ajene several times.

Davis was moved to a different shift, which Williams testified made Davis even more hostile. Davis cornered her several times. Once when Williams was waiting on a table, Davis came up behind her and pushed himself up against her and held her arms. Williams stated that she "felt his whole front side on [her] backside," that is, he pressed his whole body—including his "pelvic region"—up against her. She could feel him breathing on her neck, and he shook her and said to the customers, "Isn't she great? Isn't she wonderful?" Davis held himself so tight against her that she was pushed into the counter she was standing behind, and trapped her there until he left.[68] On several occasions, he trapped her against the counter or against the grill.

When Williams would put plates away above the grill, Davis would move his arm across to rub against her breasts. Once when Williams went to the refrigerator, when she turned around, Davis was blocking her path with his arm up on the freezer door. She asked him to move, but he did not. She finally had to duck under his arm to get around him. Another time, after Davis had been

_____

[68]We question the relevancy of Waffle House's counsel's question to Williams at trial about whether she was actually trapped by Davis because, "Well, you could have just crawled over the table, couldn't you, if you really needed to?"

24

moved to the second shift, when Williams went to the time clock to clock out, Davis was sitting by the clock playing scratch-off lottery tickets. On Ajene's advice to try to get along with Davis, Williams asked him if he had won anything. Davis chuckled and opened his hand to show her a condom. On other occasions when Davis was off duty, he would nevertheless be in the restaurant, and Williams would notice him staring at her. Sometimes he winked at her.

Williams testified that Davis was at the restaurant frequently when off the clock. His roommate also worked at the restaurant, on the same shift as Williams. Davis and his roommate shared a car, so Davis often drove his roommate to work, and Davis would spend time at the restaurant while his roommate worked.

Ajene told Williams that he would not move Davis to another restaurant or terminate his employment unless Williams found a replacement cook. Williams testified that once, Ajene showed her a picture of a man from a strip club, laughed, and said, "Look what I found here, Cathie. It's your boyfriend." This happened after she had reported Davis's conduct to Ajene.

In its defense, Waffle House produced testimony from Griffith, who worked with Williams much of the time, that she never witnessed any sexual harassment by Davis. But Griffith also agreed that it was "very possible" that things were happening between Davis and Williams that she did not see and that she preferred to stay out of matters that did not involve her. She also testified that Williams would talk to her about having ongoing problems with Davis and that

25

Williams had told her she was thinking about quitting because of Davis. Ajene, Love, Marshall, and Conley also testified that they never saw Davis harass Williams, but the evidence showed that a manager was not normally present during Williams's shift. We hold that the evidence produced by Williams at trial was some evidence, and thus legally sufficient evidence, that a reasonable person in Williams's position would have found the work environment at Waffle House to be offensive.

Waffle House argues, however, that the evidence was insufficient because Williams made this a "she said/she said" case. It points out that Williams nonsuited Davis, "and therefore no one heard his side of the story." Williams's nonsuiting of Davis was not what prevented the jury from hearing Davis's version of events because of course a person may be subpoenaed to testify even if the person is not a party to the lawsuit.[69] As Waffle House is aware, Davis did not appear for his deposition, and Williams could not find him at the time of trial. Waffle House does not explain why it did not locate Davis to have him testify or take his deposition before trial if it believed that Davis's testimony would have been helpful.

Waffle House next points out that Williams had named four potential eyewitnesses, but that only one of these people, Griffith, testified at trial, and then Williams "strenuously fought to keep out crucial parts of Griffith's testimony

_____

[69]*See* Tex. R. Civ. P. 176.6 (requiring a person who has been served with a subpoena to comply with it).

26

that indicated that Williams herself participated in sexual banter or suggestive behavior." There is no evidence in the record—absolutely none—that Williams ever engaged in this kind of "banter" with Davis. Giving Waffle House the benefit of the doubt, we assume that it is not taking the position that a woman who engages in conversation of a sexual nature with one person could never be sexually harassed, under the theory that such a woman could not possibly find it offensive when unsolicited sexual comments or acts are directed at her by anyone. But then we are at a loss as to why Waffle House keeps pointing out this testimony, much less referring to it as "crucial," considering that both this court and the Supreme Court of Texas have said that the trial court properly excluded it.[70] This testimony may have been "crucial" to a strategy to prejudice the jury against Williams, but not to establish that she did not find Davis's conduct offensive or that the conduct did not create a hostile work environment. We are baffled as to why we need to point this out to Waffle House for a third time.

The jury, as the sole judge of credibility, was entitled to believe Williams's testimony. The fact that the jury did not hear Davis's side of the story does not make the evidence legally or factually insufficient. To the extent that Waffle

---

[70]*Waffle House II*, 313 S.W.3d at 813 (describing evidence of Williams' "general sexual proclivities" as "prejudicial" and stating that "its probative value as to whether Williams welcomed sexual advances from Davis strikes us as marginal"); *Waffle House I*, 314 S.W.3d at 18 (holding that the trial court's belief that the testimony had no relevance other than to unfairly prejudice the jury was not arbitrary or unreasonable).

House alleges that facts may never be established by the testimony of one witness, it is mistaken.[71] We conclude that the credible evidence supporting the jury's finding is not so weak or so contrary to the overwhelming weight of all the evidence that the answer should be set aside. Accordingly, we hold that the evidence is factually sufficient to support the jury's finding. We overrule the part of Waffle House's second issue relating to the sufficiency of the evidence of a hostile work environment.

**(2) Affirmative Defense to Hostile Work Environment: Prompt, Remedial Action**

When a plaintiff has established a prima facie hostile work environment claim, as Williams did in this case, the defendant employer may avoid liability by establishing an affirmative defense.[72] To prove the affirmative defense, the employer must show that (1) it exercised reasonable care to prevent and promptly correct the harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the

---

[71]*See, e.g.*, *Norwich Union Indem. Co. v. Smith*, 12 S.W.2d 558, 562 (Tex. Comm'n App. 1929, judgm't adopted) (stating that generally the testimony of one witness, if believed by a jury, is sufficient evidence to establish a controverted fact); *see also Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 401 (Tex. App.—El Paso 2002, pet. denied) (upholding favorable jury verdict on sexual harassment claim in a case characterized by the court as "a swearing-match" and noting that the jury was free to reject any or all of the testimony).

[72]*See City of Waco v. Lopez*, 259 S.W.3d 147, 151 n.3 (Tex. 2008); *Cox*, 300 S.W.3d at 435.

28

employer or to otherwise avoid harm.[73]  Question four of the jury charge tracked these elements and asked whether, based on these elements, Waffle House was legally excused from responsibility for Davis's conduct.  The jury answered "no." On appeal, Waffle House argues that it took prompt, remedial action that was reasonably calculated to end the harassment and that Williams declined to use procedures that could have aided in enabling Waffle House to take quick and decisive action.

Waffle House challenges both the legal and factual sufficiency of the jury's finding against it.  As the party relying on the affirmative defense, Waffle House had the burden of proof to establish both elements of its defense.[74]  Because Waffle House complains of the jury's failure to make a finding in its favor on a question for which it had the burden of proof, on appeal Waffle House must show that it established the affirmative defense as a matter of law or that the jury's failure to find is against the great weight and preponderance of the credible evidence.[75]

---

[73]*See Lopez*, 259 S.W.3d at 151 n.3; *Cox*, 300 S.W.3d at 435.

[74]*Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270 (putting burden on employer to establish this affirmative defense); *see also Garner v. Fidelity Bank, N.A.*, 244 S.W.3d 855, 861 (Tex. App.—Dallas 2008, no pet.) (stating that party asserting affirmative defense bears the burden of proving it).

[75]*See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see also Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

In its brief, Waffle House points out evidence that it contends supported its affirmative defense. It notes that after hearing about Williams's complaint, Ajene "promptly confronted Davis" and then moved Davis to a different shift, even though Davis denied the conduct. After the shift change, Williams and Davis only had to work together for a total of about eighteen hours, due to overlap during the shift change. Other managers asked Griffith "to look out for interaction between Davis and Williams," and Marshall assisted Williams in calling the Waffle House associate hotline for reporting harassment. Love told Davis that he would not tolerate sexual harassment and informed Conley, the new district manager, of Williams's allegations. Conley asked Williams to put her complaint in writing. Love told Griffith to report back to him if she saw any incident between Williams and Davis. Waffle House argues that, based on this evidence (which, according to Waffle House, shows that it took prompt, remedial action), the jury's finding is against the great weight and preponderance of the evidence.

Waffle House also argues that the great weight and preponderance of the evidence supported an affirmative finding on the second element of its affirmative defense because it showed that Williams declined to use procedures that could have aided in enabling Waffle House to take quick and decisive action. Waffle House contends that Williams "knew or should have known that the company policy was that an employee 'has not officially reported the [sexually harassing act] until'" the employee has called the hotline. Waffle House provides an employee complaint hotline as part of its sexual harassment policy. The hotline

allows employees to report complaints to corporate management without going through lower level managers. Yet, Waffle House argues, Williams did not immediately call the hotline, and she never successfully called the hotline on her own. Based on this evidence, Waffle House argues that the jury's finding is against the great weight and preponderance of the evidence.

We disagree with Waffle House's arguments as to both elements. We previously held that Waffle House "did not take reasonable precautions to prevent interaction between Williams and Davis in the restaurant," and our review of the evidence does not compel us to reach a different conclusion on remand.[76]

Ajene was the first Waffle House manager to learn of Williams's problems with Davis. Ajene thus knew of the problem although the parties disputed at trial whether Williams told Ajene herself or whether Ajene was told about it by Griffith (who had been told about it by Williams). Ajene spoke to Davis, who denied the allegations. Ajene testified at trial that when he spoke to Davis, he was not sure specifically what Williams's complaint against Davis consisted of because Williams would not talk about it with him.

Ajene nevertheless moved Davis to the second shift, which Ajene testified made Davis "very mad." Ajene testified that he then "kept his eyes open" for any problems between Davis and Williams during the shift change. During the nearly eight months after Davis moved shifts, Williams and Davis worked together a

---

[76]*Waffle House I*, 314 S.W.3d at 11.

31

total of about 18.5 hours, when their shifts overlapped. Williams testified, however, that Davis was at the restaurant many times when not on the clock, eating meals and picking up his pay.

Although Ajene moved Davis to the second shift, he did not take any steps to ensure that Davis did not interact with Williams in the restaurant when Davis was not working or when their shifts overlapped. Ajene acknowledged in his testimony that he did not call the hotline, did not report the complaint to Marshall, his district manager, did not make a written report (although he did once see fit to write up Davis for his temper), and did not report Williams's complaint to anyone at Waffle House, even though he had an obligation to do so under Waffle House's sexual harassment policy.

On cross-examination, Ajene claimed that he had asked Williams about the harassment on more than one occasion but she always said, "Don't worry. I'll take care of it." But he also agreed that the matter was not something that employees should handle themselves and that Williams was not in any position, other than calling the hotline, to fix it herself. Furthermore, Williams denied telling anyone that she could handle the problem herself, and the jury was entitled to believe her testimony.[77] The jury was also entitled to believe Williams's testimony that Ajene told her that he would not move Davis to another store unless Williams found a replacement for him.

---

[77] *See R.W.*, 129 S.W.3d at 738.

After Love replaced Ajene, Williams complained to him about Davis's conduct and told him that she was still encountering Davis at work. Love did not investigate the complaints and did not investigate whether problems were continuing. He also did not attempt to ensure that Davis did not interact with Williams in the restaurant, and at trial, he acknowledged that they still encountered each other at work. He told her that there was no way to structure their shifts for her to avoid her coming into contact with Davis as long as they were both employed at the same restaurant. Williams testified that no one ever gave her the option of transferring her to another store but that she would have taken that option had it been given to her.

Love did report the problem to Marshall, his district manager, but he did not follow up to find out if anything had been done. And once a new district manager replaced Marshall, Love did not report Williams's complaints to him until Williams threatened to quit. When Williams quit, Love left a message on her answering machine in which he stated that they could work it out so that she would not have to see Davis, but his suggestion was that she come into work late and leave early. He also told her that "[t]his puts us in a bad situation with staffing and it wasn't our problem." Love testified that his suggestion of changing her schedule did not mean cutting her hours; it meant "being able to put a schedule together that made her comfortable with continuing to work with Waffle House." He also explained that by telling Williams that her quitting put the restaurant in a bad position and "wasn't our problem," he meant that "Conley and

33

I were not on board at the beginning of her employment or [Davis's] employment, and I, in my mind, wanted the people that were on board prior to me coming on board to tell me where the situation was because I had no knowledge." The jury, however, did not have to accept these explanations as true.[78]

Williams discussed the issue with Marshall, the district manager. Marshall spoke with Davis about Williams's allegations, and again Davis denied them.

Marshall attempted to call the hotline with Williams after she told him that she had tried to use the hotline before but worried she had not dialed correctly. Marshall did not, however, report to the hotline on his own, did not conduct an investigation of Williams's complaints, did not follow up with Williams to determine if any investigation had been made by Waffle House's corporate management, and, importantly, like the other managers involved, did not ensure that Davis and Williams would have no interaction in the restaurant.

District manager Conley, who had replaced Marshall, told Williams to write a letter documenting her claims. Conley reported Williams's claim to Kevin Ross, the divisional manager. Williams tried to give her letter to Love, who initially refused to accept it because he thought it should go directly to Conley, even though Conley was on vacation at the time. Conley could not remember what he had done with the letter once he had received it, but he stated that he knew that he had turned it over to somebody. Conley did not attempt to ensure that

---

[78] *See id.*

Williams and Davis had no interaction in the restaurant. He did not interview Davis or ask him for a statement.

Although a call was made to a Waffle House hotline, no investigation was ever made of Williams's complaints. Waffle House argues that Williams called the wrong Waffle House hotline number, but even if she had, she also reported her complaint to four different managers, and the evidence shows that none of the managers followed up with Williams as to whether the complaints were being investigated or whether the problems were ongoing, ensured that Williams and Davis would have no interaction on the work premises, or attempted to supervise Davis when he was in the store off-duty to prevent the type of behavior that Williams reported.

Martha Hensen, a Waffle House employee, testified that Waffle House made no investigation of Williams's complaint because Waffle House had no record of the call and the complaint was never put into their case management system. Hensen is a case manager for Waffle House, and in her job she investigates complaints of violations of company policy. She testified that when a message is left on the hotline voicemail, someone from the office listens to it and writes the information down on a legal pad. That person is supposed to then input that information into the computer. If a mistake was made on the part of the person who listened to the message in writing it down or putting it into the computer, there is no way to go back and find out if a mistake was made. The jury apparently believed that this system was not sufficient to show that Waffle

35

House exercised reasonable care to prevent and promptly correct harassing behavior.

Valencia Porter, Waffle House's in-house employment counsel, testified as Waffle House's representative. She stated that no investigation of Williams's claims was made by the legal department prior to Waffle House receiving the EEOC complaint because Waffle House was unaware of the problem before that time. She stated that she did not know what happened to the letter Williams gave to Conley. Porter also stated that Waffle House had no record of the hotline call made by Marshall and Williams, which she explained by stating that they may have called and left a message with Waffle House's workers' compensation hotline or some other Waffle House 1-800 number by mistake. If they had called the correct hotline, she "wouldn't know what happened" as to why Waffle House did not investigate the complaint or have a record of it.

Porter also testified that because the EEOC complaint had come in while she was on maternity leave, the complaint had been investigated by Waffle House's outside counsel. Although Porter testified as Waffle House's representative, she was not aware of actions that the outside counsel had taken in the investigation. She did not know what statements, if any, were taken, including whether Davis, Marshall, Conley, Love, or Ajene were interviewed, or the content of any statements that were given. Porter stated that although each of the managers had testified that Waffle House did not follow up with them on Williams's complaint with an investigation, this did not indicate that they were not

36

interviewed because "they may not recall being interviewed by our attorney or they may not realize that's what you're talking about when you say follow-up." The jury was free to disagree with Porter's interpretation of the managers' testimony.

Furthermore, the jury may have found inadequate Porter's suggestion that Williams and Marshall may have called and left a message with the workers' compensation number or other Waffle House number by mistake because even if Williams and Marshall had done so, they still would have left a message with Waffle House's corporate offices, which failed to follow up on the complaint. Furthermore, Hensen also testified that every Waffle House manager is required to report sexual harassment regardless of whether the employee reports it. In this case, none of the managers personally reported the harassment to the hotline, and only Marshall made sure that Williams herself had called the hotline.

Based on the evidence, the jury's finding that Waffle House did not exercise reasonable care to prevent and promptly correct the harassing behavior is not against the great weight and preponderance of the evidence.

As for Williams's actions in using procedures that could have helped Waffle House to take quick and decisive action—that is, calling the hotline— Waffle House is correct that Williams did not call the hotline immediately. But Williams testified that Ajene had told her not to and that he would handle the problem himself. And when she did call the hotline, Waffle House took no action. Waffle House argued that she called the wrong number, but even under Waffle

37

House's theory—that she had called its workers' compensation hotline or another one of Waffle House's 1-800 numbers—Williams reported sexual harassment to Waffle House, but no investigation of her complaint was made. We cannot say that the jury's finding on this element is against the great weight and preponderance of the evidence or that Waffle House established its affirmative defense as a matter of law. We therefore overrule this part of Waffle House's second issue.

**(3) Constructive Discharge Finding**

Waffle House also argues under its second issue that the jury's constructive discharge finding is not supported by legally or factually sufficient evidence. The jury was instructed that "[a]n employee is considered to have been constructively discharged when conditions are so intolerable that a reasonable person in the employee's position would have felt compelled to resign."[79] In question two of the charge, the jury answered in the affirmative

---

[79] *See Baylor Univ. v. Coley*, 221 S.W.3d 599, 603, 605 (Tex. 2007) (stating that a jury is correctly instructed on constructive discharge when told that "[a]n employee is considered to have been discharged when *an employer* makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign" (emphasis added)). Waffle House does not argue that because of the slight difference in wording between the charge in this case and the charge in *Coley*, the charge in this case was an incorrect statement of the law, and we are therefore not called upon to consider the question. *See Suders*, 542 U.S. at 141, 124 S. Ct. at 2351 (stating that the question was whether "working conditions [had] become so intolerable that a reasonable person in the employee's position would have felt compelled to resign" and not specifying that it must be the employer who causes the intolerable conditions). We comment on the difference only to acknowledge its existence and not to assign it any weight or significance.

when asked if Williams had been constructively discharged from her job at Waffle House. The jury also found that the discharge occurred at least in part as a result of an official action.

Waffle House first contends that because there was no evidence to support Williams's hostile work environment sexual harassment claim, there is no predicate for constructive discharge, and her claim fails.[80] Because we have held that the evidence was sufficient on Williams's hostile work environment claim, we reject this argument.

Waffle House then argues that to show constructive discharge, Williams had to show "aggravating factors" demonstrating greater severity or pervasiveness of harassment than the minimum required to prove hostile work environment, including

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; . . . [5] badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or [6] offers of early retirement [or continued employment on terms less favorable than the employee's former status].[81]

---

[80]*See Suders*, 542 U.S. at 149, 124 S. Ct. at 2356 ("Creation of a hostile work environment is a necessary predicate to hostile-environment constructive discharge case.").

[81]*Cox*, 300 S.W.3d at 433–34 (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.), *cert. denied*, 534 U.S. 817, 122 S. Ct. 45 (2001)).

39

It contends that Williams was unable to produce a scintilla of evidence on any of these aggravating factors. Accordingly, it contends, her constructive discharge claim fails.

The United States Supreme Court in *Suders* did not set out any specific factors that a plaintiff *must* show to establish constructive discharge in a hostile work environment sexual harassment claim. It merely stated an objective inquiry: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"[82] But the Court did make clear that a constructive discharge claim "entails something more" than what is required to establish a hostile work environment claim; whereas a hostile work environment sexual harassment claim is established by showing that "harassing behavior 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment,'" a constructive discharge claim requires a further showing that "the abusive working environment became so intolerable that her resignation qualified as a fitting response."[83] The factors listed by Waffle House are factors that the Fifth Circuit considers relevant to constructive discharge,[84]

---

[82] *Suders*, 542 U.S. at 141, 124 S. Ct. at 2351; *see also City of Fort Worth v. DeOreo*, 114 S.W.3d 664, 677 (Tex. App.—Fort Worth 2003, no pet.).

[83] *Suders*, 542 U.S. at 133–34, 124 S. Ct. at 2347.

[84] *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994) (noting that "whether a reasonable employee would feel compelled to resign depends on the facts of each case" but that it considered the enumerated factors relevant to that determination); *see also Cox*, 300 S.W.3d at 433–34 (noting that

and we agree that they have relevance, particularly in determining whether an official act underlies the constructive discharge.[85] But we disagree that an employee may not prove constructive discharge without establishing these factors.[86] If the employee shows that, considering the circumstances, a reasonable person in the employee's position would have felt compelled to resign, the employee has met her burden of proof.[87]

In this case, Williams testified that she reported Davis's behavior to four managers, and this testimony was corroborated by the managers themselves. Williams also testified that she and Marshall called the Waffle House hotline. Whether or not they mistakenly called the wrong Waffle House number, it is undisputed that no action was ever taken in response to the phone call, whichever Waffle House telephone line received the message, and that none of her managers followed up with Waffle House corporate offices or with Williams to find out if an investigation was underway. Love was aware that Williams was considering quitting based on Waffle House's lack of response to her complaints,

---

the Fifth Circuit has considered those factors in determining a constructive discharge claim).

[85] *See Suders*, 542 U.S. at 148, 124 S. Ct. at 2355 (stating that "when an official act does not underlie the constructive discharge," the *Ellerth/Faragher* affirmative defense may be asserted by the employer).

[86] *See, e.g., id.* at 148, 124 S. Ct. 2355 (stating that "harassment so intolerable as to cause a resignation may be effected *through co-worker conduct*" (emphasis added)).

[87] *Id*. at 141, 124 S. Ct. at 2351.

yet he never followed up with anyone to see if Waffle House's upper management was in fact investigating. All the while, Davis's behavior continued unabated—behavior that we have already held was sufficient to demonstrate a hostile work environment. And after Davis was told of her complaints, his behavior became more hostile. Yet Waffle House did not offer to transfer Williams to another store, and Love told Williams that there was no way to structure their shifts so as to avoid her coming into contact with Davis as long as they were both employed at the same restaurant. To a reasonable person in Williams's position, it would appear that no matter how many times she reported, in what manner she reported, or to whom she reported, nothing would change, despite Davis's continued harassment and escalating hostility. Applying the appropriate standards of review, we hold that the evidence was both legally and factually sufficient for a jury to find that a reasonable person in Williams's position would have felt compelled to resign.[88]

Waffle House further contends under this argument that "prompt remedial action is fatal to a claim of constructive discharge." We note that whether Waffle House was entitled to assert the affirmative defense to Williams's claim of

---

[88]*See Gonzales*, 72 S.W.3d at 410 (holding that under the evidence, it was reasonable for a jury to conclude that the plaintiff had been constructively discharged "in that he felt he had no alternative but" to remain in the department and endure the harassment in order to keep his job when the harassment continued after the plaintiff's complaint and the initiation of an investigation, the plaintiff was never informed of the results of any investigation, and he was refused a transfer).

constructive discharge has not been specifically addressed by the United States Supreme Court. The Court in *Suders* expressly declined to set out a standard for employer liability for co-worker harassment, as was alleged in this case, although it recognized that "harassment so intolerable as to cause a resignation may be effected through co-worker conduct."[89] But applying the rationale of the Court in that opinion, Waffle House was entitled to assert the affirmative defense to Williams's constructive discharge claim if Williams's decision to resign was in response to an employer-sanctioned adverse employment action.[90] In this case, the jury found that the constructive discharge was precipitated by official action, in which case, under the United States Supreme Court's reasoning in *Suders*, the affirmative defense was not available to Waffle House. But we need not decide the standard to apply in coworker harassment constructive discharge claims here because, as discussed above, the jury found against Waffle House on its affirmative defense. We therefore reject Waffle House's contention that its actions in response to Williams's complaints defeat her constructive discharge claim.

---

[89] *Suders*, 542 U.S. at 143 n.6, 148, 124 S. Ct. at 2352 n.6, 2355.

[90] *Id.* at 134, 148–49, 124 S. Ct. at 2347, 2355 (noting that absent an official act of the employer, "the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force," and "the extent to which the supervisor's misconduct has been aided by the agency relation . . . is less certain," and therefore the employer should be afforded the chance to establish the affirmative defense in the absence of an official action leading to the employee's decision to resign).

Because the evidence was sufficient to support the jury's finding that Williams had been constructively discharged, we overrule the part of Waffle House's second issue relating to constructive discharge.

## B. *Jury's Finding on Malice or Reckless Indifference*

Finally, Waffle House also argues under this issue that the jury's "malice or reckless indifference" finding is not supported by legally or factually sufficient evidence. Section 21.2585 of the labor code provides that a plaintiff may recover punitive damages from a defendant who engaged in an unlawful intentional employment practice if the plaintiff demonstrates that the defendant engaged in the discriminatory practice with malice or with reckless indifference to the state-protected rights of the plaintiff.[91]

We addressed Waffle House's sufficiency argument in our previous opinion.[92] Waffle House argues that we should reconsider its arguments because in the prior appeal "the only punitive damages before [this court] were those predicated on the negligence findings, . . . and [this court] did not address the issue of whether Williams'[s] alternative trial theories could support the judgment."

The jury was not asked to make separate "malice or reckless indifference" findings for the sexual harassment claim and the negligence claim; the question

---

[91]Tex. Lab. Code Ann. § 21.2585(a),(b).

[92]*See Waffle House I*, 314 S.W.3d at 20–22.

44

asked whether the jury found clear and convincing evidence that Waffle House engaged in the conduct asked about in previous questions (including sexual harassment) with malice or reckless indifference to Williams's right to be free from such conduct. And our previous analysis of the evidence supporting the finding was not premised on the jury's finding of negligence. Our previous analysis is equally applicable to Williams's statutory sexual harassment claim, and we see no need to re-examine it here. We incorporate our previous analysis and our holding that "the evidence presented is such that the jury could have reasonably formed a firm belief or conviction that the failure to act by Waffle House managers created an extreme degree of risk to Williams and showed a conscious indifference to Williams's rights, safety, or welfare."[93] We overrule this part of Waffle House's second issue. Having overruled all of Waffle House's subarguments, we overrule Waffle House's second issue.

The jury awarded Williams $400,000 for past compensatory damages, $25,000 for future compensatory damages, and $3,460,000 in punitive damages. Section 21.2585(d) of the labor code, however, caps the amount of compensatory damages that may be awarded for a claim made under that chapter, including punitive damages. Under the cap applicable in this case, Williams could not be awarded more than $300,000. Williams did not argue to the trial court or on appeal that the cap does not apply.

---

[93]*Waffle House I*, 314 S.W.3d at 22.

Accordingly, we modify the trial court's judgment to delete the punitive damages award and reduce the award of total compensatory damages to $300,000.

## IV. Conclusion

Having overruled Waffle House's issues, and having modified the trial court's judgment to award Williams total compensatory damages of $300,000, we affirm the trial court's judgment as modified regarding those damages and to the extent that it adopts the jury's findings on the TCHRA claim and awards $4,728.60 in taxable court costs, prejudgment interest of five percent per annum calculated from November 2, 2002 until July 29, 2005, and postjudgment interest at the rate of five percent per annum on the total amount of the final judgment less prejudgment interest, compounded annually, beginning July 30, 2005, until fully paid. But because neither the trial court nor the jury made findings respecting Williams's attorney's fees and expert costs, which the trial court may award to the prevailing party in a claim under the TCHRA,[94] and because the amounts of prejudgment and postjudgment interest will need to be recalculated, we reverse the trial court's judgment as to these matters and remand this case to the trial court for determination of the issues of (1) attorney's fees, (2) expert costs, (3) the amount of prejudgment interest of five percent per annum calculated from November 2, 2002 until July 29, 2005, and (4) the amount of

---

[94]Tex. Lab. Code Ann. § 21.259(a), (c).

46

postjudgment interest, based on the total amount of the final judgment less prejudgment interest, and calculated at five percent per annum, compounded annually, beginning July 30, 2005, until fully paid.

LEE ANN DAUPHINOT<br>
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED:  August 25, 2011